# United States Court of Appeals

*for the*

# Third Circuit

Case No. 25-1698

MAURICE BOSTON,

*Appellant,*

– v. –

GRAPHIC PACKAGING INTERNATIONAL, LLC

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA IN CASE
NO. 2:22-CV-03473, JOHN R. PADOVA, U.S. DISTRICT JUDGE

## BRIEF OF PLAINTIFF-APPELLANT

ANDREW LACY, JR., ESQ.
THE LACY EMPLOYMENT LAW FIRM
*Attorney for Plaintiff-Appellant*
3675 Market Street, Suite 200
Philadelphia, PA 19104
(215) 399-9761
andrew.lacy@employment-labor-law.com

CP COUNSEL PRESS    (800) 4-APPEAL • (813248)

## <u>DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit Local Appellate Rule 26.1, Appellant Maurice Boston, who is not a corporation, has no parent corporation, and no publicly held corporation owns 10% or more of any stock. There are no publicly traded corporations or other publicly traded entities that have a direct financial interest in the outcome of this litigation.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT

TABLE OF CONTENTS ................................................................................i

TABLE OF AUTHORITIES..................................................................... iv

JURISDICTIONAL STATEMENT...........................................................1

STATEMENT OF THE ISSUES................................................................2

STATEMENT OF RELATED CASES ......................................................4

INTRODUCTION ......................................................................................5

CONCISE STATEMENT OF THE CASE ................................................7

    A.    Procedural History.................................................................7

    B.    Statement of Facts ................................................................7

        1.    Mr. Boston Maintained An Excellent Employment Record At GPI Despite A Lack Of Diversity In Managerial Roles .......................................7

        2.    GPI allowed, maintained, and perpetuated a racially discriminatory workplace culture.....................9

        3.    GPI consistently exhibited a pattern of discriminatory treatment toward Mr. Boston .............12

        4.    GPI asserts a negative performance that is inconsistent with their own records of Mr. Boston's performance evaluations...............................14

        5.    GPI continued to escalate a discriminatory campaign against Mr. Boston that culminated in GPI terminating his employment during his brother's murder ........................................................15

SUMMARY OF THE ARGUMENT ........................................................18

ARGUMENT............................................................................................20

I.   THE COURT SHOULD REVERSE AND REMAND MR. BOSTON'S TITLE VII AND SECTION 1981 RACE DISCRIMINATION CLAIMS ........................................................ 20

II.  THE DISTRICT COURT APPLIED THE WRONG LEGAL STANDARD UNDER MULDROW ............................................. 22

     A.   GPI's Targeted Transfers Meet The "Some Harm" Threshold ........................................................................ 23

     B.   GPI's Discriminatory Culture Supports An Inference Of Race-Based Intent ............................................... 25

III. GPI'S SHIFTING AND IMPLAUSIBLE EXPLANATIONS CONFIRM PRETEXT ............................................................. 28

     A.   GPI Offered No Business Reason For Mr. Boston's Involuntary Transfers ............................................ 28

     B.   GPI Failed To Justify Its Other Actions Against Mr. Boston ........................................................................ 29

IV.  GPI'S PROVIDED REASONS FOR THE HARMS MR. BOSTON SUFFERED ARE ALL PRETEXTUAL ......................... 30

     A.   Mr. Boston's Termination Was The Culmination Of GPI's Discriminatory Pattern .............................. 33

     B.   GPI's Other Purported Comparators Fail .................... 34

     C.   GPI's Termination Of Mr. Boston Confirms Its Pattern Of Discriminatory Behavior ............................. 36

V.   THE DISTRICT COURT FAILED TO CONSIDER MIXED MOTIVE ................................................................................ 37

VI.  MR. BOSTON'S HOSTILE WORK ENVIRONMENT CLAIMS SURVIVE UNDER TRADITIONAL AND MULDROW STANDARDS .......................................................... 38

     A.   The Severity Of The Discriminatory Incidents Mr. Boston Experienced Establishes GPI As A Hostile Work Environment ................................................... 38

B.    The Pervasive Pattern Of Daily Harassment That Mr. Boston Suffered Reinforces That Gpi Is A Hostile Work Environment ..................................................... 40

C.    Mr. Boston's Hostile Work Environment Claim Must Survive Under Muldrow ...................................................... 40

D.    GPI Cannot Invoke The Ellerth Defense ............................ 41

VII.  MR. BOSTON'S RETALIATION CLAIMS SURVIVE UNDER THE CORRECT LEGAL STANDARD ........................... 43

A.    GPI's Decision-Makers Attested To Having And Witnessing Direct Retaliatory Intent ................................. 43

B.    The Record Establishes That GPI Showed A Clear Pattern Of Escalating Antagonism Toward Mr. Boston ................................................................................. 44

C.    The Evidence Creates Genuine Issues Of Material Fact. ...................................................................................... 47

D.    GPI's Stated Reasons For Mr. Boston's Termination Are Pretextual ..................................................................... 48

CONCLUSION ................................................................................. 49

CERTIFICATE OF COMPLIANCE ...................................................... 51

COMBINED CERTIFICATE ............................................................... 52

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abramson v. William Paterson College,*
260 F.3d 265 (3d Cir. 2001) ...................................................... 31

*Adams v. Austal, U.S.A.*, LLC,
754 F.3d 1240 (11th Cir. 2014) ................................................. 39

*Ames v. Ohio Department of Youth Services,*
145 S. Ct. 1540 (2025) ........................................................... 6, 37

*Antol v. Perry,*
82 F.3d 1291 (3d Cir. 1996) .................................................. 26, 27

*Branch v. Temple University,*
554 F. Supp. 3d 642 (E.D. Pa. 2021) ....................................... 31

*Brewer v. Quaker State Oil Ref. Corp.,*
72 F.3d 326 (3d Cir. 1995) ....................................................... 26

*Brown v. J. Kaz, Inc.,*
581 F.3d 175 (3d Cir. 2009) ..................................................... 20

*Burlington Indus. v. Ellerth,*
524 U.S. 742 ............................................................................ 41

*Bush v. Commonwealth Edison Co.,*
990 F.2d 928 (7th Cir. 1993) .................................................... 35

*Canada v. Samuel Grossi & Sons, Inc.,*
49 F.4th 340 (3d Cir. 2022) ........................................... 21, 30, 36

*Carvalho-Grevious v. Del. State Univ.,*
851 F.3d 249 (3d Cir. 2017) ..................................................... 48

*Castleberry v. STI Group,*
863 F.3d 259 (3d Cir. 2017) ................................................ 38, 39

*Fuentes v. Perskie,*
32 F.3d 759 (3d Cir. 1994) ....................................................... 30

*Goosby v. Johnson & Johnson Med., Inc.,*
228 F.3d 313 .......................................................................... 29

iv

*Grabosky v. Tammac Corp.*,
   127 F. Supp. 2d 610 (M.D. Pa. 2000)..................................................27

*Int'l Bhd. of Teamsters v. United States*,
   431 U.S. 324 ........................................................................................26

*Jenkins v. Cornerstone Relocation Grp., LLC*,
   Civil Action, No. 23-1755 (MAS) (JTQ), 2025 U.S. Dist. LEXIS
   18058 (D.N.J. Jan. 31, 2025) .............................................................49

*Josey v. John R. Hollingsworth Corp.*,
   996 F.2d 632 (3d Cir. 1993) ...............................................................25

*Kachmar v. SunGard Data Sys., Inc.*,
   109 F.3d 173 (3d Cir. 1997) ...............................................................43

*Mandel v. M & Q Packaging Corp.*,
   706 F.3d 157, (3d Cir. 2013) ...............................................................22

*McClain v. Pa. Dep't of Corr.*,
   2011 U.S. Dist. LEXIS 73230 (W.D. Pa. July 7, 2011)......................33

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973) ...............................................................6, 22, 37

*Minarsky v. Susquehanna Cnty.*,
   895 F.3d 303 (3d Cir. 2018) ...............................................................41

*Muldrow v. City of St. Louis*,
   601 U.S. 346 (2024) ..................................................................*passim*

*Phillips v. Starbucks Corp.*,
   624 F. Supp. 3d 530 (D.N.J. 2022) ...............................................28, 31

*Small v. Lehman*,
   98 F.3d 762 (3d Cir. 1996) .................................................................34

*Tomasso v. Boeing Co.*,
   445 F.3d 702 (3d Cir. 2006) ...............................................................32

*Weldon v. Kraft, Inc.*,
   896 F.2d 793 (3d Cir. 1990) ...............................................................29

**Statutes & Other Authorities:**

28 U.S.C. § 1291 ................................................................................ 1

28 U.S.C. § 1331 ................................................................................ 1

42 U.S.C. § 1981 ......................................................................... 1, 20

42 U.S.C. § 2000e ............................................................................. 1

Fed. R. App. P. 4(a)(1)(A) .............................................................. 1

Fed. R. Civ. P. 56 ............................................................................. 6

## JURISDICTIONAL STATEMENT

This Court has appellate jurisdiction over the final order of the District Court for the Eastern District of Pennsylvania granting Defendant-Appellee Graphic Packaging International, LLC's Motion for Summary Judgment pursuant to 28 U.S.C. § 1291. [Appx. Vol. I, 2].

This Court has appellate jurisdiction over the final order of the District Court for the Eastern District of Pennsylvania granting Defendant-Appellee Graphic Packaging International, LLC's Motion for Summary Judgment pursuant to 28 U.S.C. § 1291. [Appx. Vol. I, 2].

The District Court possessed subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. [Appx. Vol. II, 738].

The District Court entered its final order granting summary judgment on March 24, 2025. [Appx. Vol. I, 2]. Plaintiff-Appellant Maurice Boston timely filed his amended notice of appeal on April 17, 2025, within the 30-day period prescribed by Federal Rule of Appellate Procedure 4(a)(1)(A). [Appx. Vol. I, 1].

## STATEMENT OF THE ISSUES

1. Whether the District Court erred in applying a pre-*Muldrow* materially adverse employment action standard instead of the "some harm" standard mandated by *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), when evaluating Mr. Boston's discrimination claims based on involuntary transfers, manufactured discipline, selective enforcement, and termination during bereavement leave.

2. Whether the District Court erred in granting summary judgment on Mr. Boston's hostile work environment claim where the record shows: (1) a coworker called Mr. Boston the n-word; (2) a swastika remained visible in the workplace bathroom; (3) GPI maintained zero Black employees in supervisory positions; and (4) GPI subjected Mr. Boston to a pattern of discriminatory harassment.

3.    Whether the District Court erred in granting summary judgment on Mr. Boston's retaliation claims where: (1) GPI's HR Coordinator Bender, while processing his termination, stated that in the past he enjoyed filing grievances, revealing the retaliatory motive behind GPI's actions; (2) supervisors admitted being forced to discipline Mr. Boston after his discrimination complaints; and (3) GPI escalated from work-related discipline to attendance-based termination after Mr. Boston's protected activity.

4.    Whether the District Court erred in finding no genuine issues of material fact where GPI's own records show: (1) Mr. Boston was a record-setting performer; (2) White comparator Michael Antenucci received multiple chances for identical attendance violations; and (3) GPI violated its own progressive discipline policy when terminating Mr. Boston.

## **STATEMENT OF RELATED CASES**

Pursuant to Third Circuit Local Appellate Rule 28.1(a), counsel for Appellant is unaware of any other case or proceeding that is in any way related, completed, pending, or about to be presented before this Court or any other court or agency, state or federal. This case has not previously been before this Court

## **INTRODUCTION**



This swastika remained carved in the bathroom wall at Graphic Packaging International's Valley Forge facility throughout Maurice Boston's employment. When shown this photograph during his deposition, GPI's Human Resources Manager refused to acknowledge it was racist. No Black employee held a supervisory position at this facility. A coworker called Mr. Boston the n-word. Supervisors admitted they were forced to write Mr. Boston up after he complained about racial harassment. And when Mr. Boston's brother was murdered – shot in the head at a Philadelphia convenience store – GPI seized that moment of unimaginable grief to terminate him.

5

The District Court dismissed all of Mr. Boston's claims by mechanically applying the *McDonnell Douglas* framework at summary judgment. But this was wrong. The Supreme Court just questioned this approach in *Ames v. Ohio Department of Youth Services*, 145 S. Ct. 1540 (2025). As Justice Thomas observed in his concurrence:

> My first concern is that the *McDonnell Douglas* framework is incompatible with the summary-judgment standard set forth in Federal Rule of Civil Procedure 56.... [T]he framework does not speak in terms of "genuine dispute[s]" regarding the facts. Instead, it speaks in terms of "proving" facts "by the preponderance of the evidence." That difference is significant because "a plaintiff need not establish or prove any elements— by a preponderance or otherwise—to survive summary judgment." In my view, requiring a plaintiff to satisfy the *McDonnell Douglas* framework—as this Court has described it—requires a plaintiff to prove too much at summary judgment.

*Id.* at 1553-54 (Thomas, J., concurring). The District Court fell into precisely this trap, dismissing Mr. Boston's discrimination claims not because he lacked evidence of discrimination, but because he successfully grieved some of it, as if defending against fabricated discipline while working beneath a swastika somehow negated the harm. This Court should reverse and allow a jury to decide whether a workplace that tolerates swastikas, racial slurs, and the systematic targeting of Black employees violates federal law.

6

## <u>CONCISE STATEMENT OF THE CASE</u>

### A. Procedural History

Mr. Maurice Boston commenced legal action against GPI by filing his complaint on August 30, 2022. GPI filed its Answer on October 10, 2022.

The Parties engaged in motion practice, culminating in the District Court's March 24, 2025, Order granting GPI's Motion for Summary Judgment. The District Court entered an Order granting GPI's Motion for Summary Judgment and dismissing all counts of Mr. Boston's complaint. [Appx. Vol. I, 2] The District Court set out its rationale for granting the Motion in a memorandum [Appx. Vol. I, 4] filed on the same day.

Mr. Boston timely filed his amended notice of appeal [Appx. Vol. I, 1] on April 17, 2025.

### B. Statement of Facts

> *1. Mr. Boston Maintained An Excellent Employment Record At GPI Despite A Lack Of Diversity In Managerial Roles.*

Graphic Packaging International, LLC, terminated Mr. Boston in June 2021 after tolerating an employee calling him a n*gger and not remediating a swastika carved in its bathroom. [Appx. Vol. II, Appx. Vol.

II, 846-847; 643 ¶15; 649]. GPI hired Maurice Boston as a Sheeter Operator on December 21, 2016. [Appx. Vol. II, 213:11-13, 213:21-24]. After hiring Mr. Boston for a 90-day probationary period, GPI transitioned Mr. Boston to a full-time, union-member employee in the same role. [Appx. Vol. II, 214: 5-14]. GPI employed Mr. Boston at its Valley Forge plant for approximately five years. [Appx. Vol. II, 212:17-20].

GPI failed to elevate any of its diverse employees to supervisors at Valley Forge. [Appx. Vol. II, 70:03-07]. During Mr. Boston's employment, GPI's Human Resources Manager, Kevin Morrison, acknowledged that GPI maintained a "very diverse plant." [Appx. Vol. II, 67:17-20]. Mr. Boston, whom GPI never promoted, held a record as a top performer at the location. [Appx. Vol. II, 644 ¶22; 664].



*Photograph of Mr. Boston's Production Records*

GPI only promoted White employees to become managers and supervisors in positions of power at the facility. [Appx. Vol. II, 641 ¶2]. Mr. Morrison, who served as the HR Manager, could not recall any Black employees holding any lead-type roles within the plant. [Appx. Vol. II, 67:17-70:25].

> ### 2. GPI allowed, maintained, and perpetuated a racially discriminatory workplace culture.

GPI's lack of Black – or any minority – employees in power translated to GPI tolerating a racially hostile environment. GPI allowed a swastika – which dozens of employees routinely walked past – to be displayed in the heavily used public bathroom. [Appx. Vol. II, 643 ¶15; 79:19-80:22]. And it was visible to at least half of the workforce, including management, who used the bathroom daily. [*Id.*] When confronted with an image of this swastika during his deposition, Mr. Morrison (GPI's Human Resource professional), declined to categorize it as inherently racist. [Appx. Vol. II, 80:02-22]. GPI took no remedial action concerning the swastika. [Appx. Vol. II, 249:19-250:07].

GPI did not have a functioning complaint system. Mr. Boston did not report the swastika because GPI had previously failed to address his

earlier reports of racism, leading him to believe further complaints would be futile. [Appx. Vol. II, 643 ¶15; 79:19-80:22]. GPI's inaction fostered an environment that discouraged reporting discriminatory conduct. [Appx. Vol. II, 643 ¶4]. And Mr. Morrison told Mr. Boston not to report complaints of discrimination. [Appx. Vol. II, 641 ¶4].

GPI tolerated Boston's coworker calling him a n*gger. On April 29, 2020, William Dennis called Boston the n-word. [Appx. Vol. II, 256:10-18; 81:6-8]. Dennis told another employee in earshot: "I can't believe that n*gger did this." [Appx. Vol. II, 846-847]. Witnesses reported the incident to management. [Appx. Vol. II, 847]. Boston emailed HR Manager Morrison, stating he was taking the matter "EXTREMELY serious!!!!!!" [Appx. Vol. II, 655].

**From:** Maurice Boston [mailto:mboston89@yahoo.com]
**Sent:** Wednesday, April 29, 2020 6:26 PM
**To:** Morrison, Kevin <Kevin.Morrison@graphicpkg.com>; Orozco, Juan <Juan.Orozco@graphicpkg.com>
**Subject:** [EXTERNAL] Core values

Caution: This email originated from outside the organization.
Do not click on links or open attachments unless you recognize the sender and know the content is safe.

I'm hearing that my coworker William Dennis used a racial slur when referring to me in front of 2 other coworkers. I hope that you guys are taking this seriously because I'm taking this EXTREMELY serious!!!!!!

GPI excluded Mr. Boston from its own investigation. Morrison testified he did not consider Mr. Boston the "complainant" despite Mr. Boston's direct complaint. [Appx. Vol. II, 83:22-84:3]. GPI initially gave Dennis only a two-day suspension – the same punishment Mr. Boston received for parking in a handicapped space. [Appx. Vol. II, 644 ¶21; 647]. Mr. Boston had to continue working with Dennis for a week after the incident. [Appx. Vol. II, 258:8-259:3]. Corporate HR later overruled Morrison and terminated Dennis. [Appx. Vol. II, 646; 115:10-16].

A recorded conversation between Mr. Boston and coworker Taylor Steele reveals GPI's tolerance for racist conduct. [Appx. Vol. II, 984-987]. Steele expressed surprise that Dennis faced any discipline for using the n-word: "I was actually surprised he got that." [Appx. Vol. II, 984]. Steele confirmed this was part of a pattern, stating he had previously warned Dennis about making derogatory racial comments and concluding, "this is the second time in a row, this is obviously a pattern." [Appx. Vol. II, 985-987].

GPI never considered remedying the environment for Mr. Boston. Throughout its investigation into the racial slur, GPI did not interview Mr. Boston. [Appx. Vol. II, 257:9-12; 91:09-25]. Mr. Morrison justified this

11

by stating Mr. Boston "was not a party of the investigation." [Appx. Vol. II, 86:11-19]. GPI also did not inquire whether Mr. Boston was facing any other forms of racial discrimination or harassment at its facility. [Appx. Vol. II, 92:05-15]. Mr. Morrison focused more on how Mr. Boston learned details of the investigation than on the misconduct Mr. Boston reported. [Appx. Vol. II, 642 ¶5].

### 3. GPI consistently exhibited a pattern of discriminatory treatment toward Mr. Boston.

GPI's racial slur incident arose from its failure to monitor the workplace and address complaints of racial discrimination. Over a year before the April 2020 incident involving William Dennis, GPI's Human Resources Manager, Kevin Morrison, learned from Mr. Boston that supervisors and coworkers – specifically Gary Moore, William Dennis, and Wayne Nonamaker – were harassing him because he is Black. [Appx. Vol. II, 641 ¶4]. Rather than investigating these serious allegations, Morrison told Mr. Boston to "document everything and nothing else." [*Id.*]. This dismissive response discouraged Mr. Boston from reporting further harassment. [*Id.*].

GPI, particularly through supervisor Gary Moore, engaged in a pattern of discriminatory discipline and harassment against Mr. Boston.

Mr. Boston's managers, Matt McMenamin and Bob Iswalt, admitted that Moore pressured them to issue write-ups for minor or fabricated infractions. [Appx. Vol. II, 292:15-293:19; 988]. Mr. Iswalt acknowledged issuing a write-up at Moore's insistence [*Id.*]. Mr. Moore also repeatedly reassigned Mr. Boston from fast, high-performing machines to unfamiliar departments, then disciplined him for performance issues arising from those changes. [Appx. Vol. II, 248:19-249:12, 274:17-22]. Several of these write-ups were later dismissed in response to Mr. Boston's grievances, exposing their lack of merit. [Appx. Vol. II, 241:8-22, 248:19-250:8]. GPI also upheld other unwarranted discipline, such as a phone-use write-up, even though Mr. Boston's union representative role permitted such use. [Appx. Vol. II, 242:18-245:5]. On one occasion, Moore verbally berated Mr. Boston, saying, "[a]re you going to finish this fucking job or are you going to keep dicking around?" [Appx. Vol. II, 242:18-245:05].

Further reflecting GPI's hostility, it created scheduling conflicts during Mr. Boston's bereavement leave. In December 2020, after Boston requested bereavement leave for his grandmother's funeral, GPI added a Saturday overtime shift to his schedule even though he did not normally

13

work Saturdays, forcing him to call out and potentially receive an attendance point if he failed to do so. [Appx. Vol. II, 379:10-381:12; 295:1-21]. Management then blamed Mr. Boston for not anticipating the schedule change and faulted him for using approved leave. [Appx. Vol. II, 228:13-17, 229:14-19, 233:4-9]. GPI also penalized Boston for fulfilling his civic duty when he physically reported to the courthouse for jury service on November 23, 2020, only to find it closed due to COVID-19, refusing to remove the attendance point despite his good faith effort. [Appx. Vol. II, 370:5-373:5, 388:2-389:3; 673].

### 4. GPI asserts a negative performance that is inconsistent with their own records of Mr. Boston's performance evaluations.

Despite its pattern of discriminatory treatment and manufactured discipline against Mr. Boston – including reassignment to unfamiliar roles and write-ups later voided through the grievance process – GPI simultaneously recognized Mr. Boston as one of its top performers. GPI documented and publicly recognized Mr. Boston as achieving "All-Time Production Records" at its Valley Forge facility, specifically noting his record set on November 16, 2019. [Appx. Vol. II, 664]. Beyond these objective metrics, GPI managers entrusted Mr. Boston with the responsibility of re-training other employees who were experiencing

14

performance issues, indicating GPI's recognition of his high skill level and competence in his role as a Sheeter Operator. [Appx. Vol. II, 287:6-24]. GPI employees considered him "really good at [his] job" and the "best in [his] department." [Appx. Vol. II, 644 ¶22].

Despite GPI's own acknowledgment of Mr. Boston's superior performance and the responsibilities it entrusted to him, GPI subjected him to frequent and often trivial disciplinary actions. [Appx. Vol. II, 250:15-21]. This pattern of GPI issuing numerous disciplinary actions, many of which it later rescinded, contrasted with GPI's documented recognition of his record-setting production.

> 5. *GPI continued to escalate a discriminatory campaign against Mr. Boston that culminated in GPI terminating his employment during his brother's murder.*

GPI's discriminatory treatment of Mr. Boston followed a deliberate escalation pattern that intensified after his protected complaints and culminated in his callous termination while grieving his brother's violent murder.

After Mr. Boston escalated his complaints by reporting Dennis's use of the N-word in April 2020, GPI's retaliation intensified dramatically. The systematic targeting shifted from work-related discipline – which

Mr. Boston kept winning through grievances – to "out-of-work things" like parking violations. [Appx. Vol. II, 268:17-23]. In March 2021, HR Manager Morrison sent Mr. Boston a suspicious text asking whether he drove a "black S class Mercedes," suggesting surveillance of his personal property. [Appx. Vol. II, 659].

By May 2021, GPI's campaign reached fever pitch. Despite Mr. Boston being a record-setting performer who trained struggling employees, GPI suspended him without pay for parking violations that other employees routinely committed without consequence. [Appx. Vol. II, 644 ¶¶20-21; 267:7-269:5]. GPI documented other employees parking in restricted spaces but took no action against them, selectively enforcing rules only against Mr. Boston. [Appx. Vol. II, 644 ¶20; 667].

In the midst of this escalating harassment, tragedy struck Mr. Boston's family. His young brother was murdered in a violent crime, shot in the head while buying something at a Philadelphia convenience store. [Appx. Vol. II, 644 ¶24]. This traumatic loss of his "brother that was young and full of life" devastated Mr. Boston, who took bereavement leave to grieve and handle funeral arrangements. [*Id.*].

16

Rather than showing compassion during this tragedy, GPI seized the opportunity to terminate Mr. Boston. While he was on approved bereavement leave mourning his brother's murder, GPI calculated that his grief-related absences had pushed his attendance points to 10.5, above their stated nine-point threshold. [Appx. Vol. II, 644 ¶24]. HR Coordinator Robin Bender knew exactly what she was doing, admitting "I do not like that all of this is coming about with the death of his brother" while proceeding with termination anyway. [Appx. Vol. II, 650, 653]. She noted that in the past, he enjoyed filing grievances and hoped he would not challenge the termination. [Appx. Vol. II, 650, 653].

This termination violated GPI's own progressive discipline policy, which required verbal warnings at three points, written warnings at five or six, and final written warnings at seven or eight before termination. [Appx. Vol. II, 578:7-579:3]. Mr. Boston had repeatedly asked HR for updates about his attendance points, yet GPI provided no warnings whatsoever. [Appx. Vol. II, 190:15-25]. GPI's 30(b)(6) witness confirmed these progressive steps were mandatory, yet the record shows they were skipped in Mr. Boston's case. [Appx. Vol. II, 578:7-579:3; 652; 644 ¶24].

17

GPI's treatment of Mr. Boston during his brother's murder contrasts with the leniency shown to other employees. White employee Michael Antenucci received multiple Last Chance Agreements and was granted additional time, despite exceeding attendance thresholds. [Appx. Vol. II, 657-658; 129:14-130:14]. But for Mr. Boston – a record-setting performer grieving his brother's violent murder – GPI showed no mercy.

The message was unmistakable: at GPI, being Black meant that even family tragedy would be weaponized against you. Mr. Boston's five-year experience of racial harassment, manufactured discipline, and systematic targeting culminated in a termination while mourning his murdered brother. This act completed GPI's campaign and exposed the depths of its racial animus.

## SUMMARY OF THE ARGUMENT

The District Court applied the wrong legal standard when it dismissed Mr. Boston's discrimination claims. The Supreme Court clarified in *Muldrow v. City of St. Louis* that Title VII requires only "some harm" to employment conditions, not the serious and tangible standard the District Court used. Under the correct standard, GPI discriminated against Mr. Boston through multiple actions: transferring him to

unfamiliar departments then writing him up for predictable performance issues, manufacturing discipline that supervisors later admitted was fabricated, selectively enforcing parking rules against him while ignoring identical violations by White employees, and terminating him during bereavement leave for his murdered brother without the progressive warnings its own policy required. The District Court dismissed these claims because Mr. Boston "successfully grieved" some discipline, but *Muldrow* explicitly rejects any requirement that harm be permanent or unremedied.

Upon applying the correct legal standard, the Court should find that Mr. Boston's termination was pretextual based on the prior discrimination that Mr. Boston suffered.

Mr. Boston's hostile work environment claim should also be reversed. A coworker called him the n-word. A swastika marked the bathroom wall. No Black employee held a supervisory position in five years despite GPI's diverse workforce. When Mr. Boston reported racial harassment, HR told him to document everything and do nothing else. GPI's own employees expressed surprise that using racial slurs resulted in any discipline at all, revealing how normalized such conduct had

19

become. These severe incidents, combined with the pervasive pattern of discriminatory treatment, created an environment that altered Mr. Boston's working conditions.

The District Court similarly erred on Mr. Boston's retaliation claim. HR Coordinator Bender, while processing his termination, stated that in the past, he enjoyed filing grievances, revealing the retaliatory motive behind GPI's actions. The timeline tells the story: Mr. Boston complained about racial harassment, GPI launched a campaign of manufactured discipline, Mr. Boston won grievances challenging that discipline, and GPI shifted to attendance violations to achieve its goal. This evidence creates jury questions that summary judgment cannot resolve.

## ARGUMENT[1]

### I. THE COURT SHOULD REVERSE AND REMAND MR. BOSTON'S TITLE VII AND SECTION 1981 RACE DISCRIMINATION CLAIMS

The pattern of systematic targeting independently establishes that a reasonable jury could find that his termination was a pretext for

---

[1] Mr. Boston's claims arise under both Title VII and 42 U.S.C. § 1981. Because the analytical framework for discrimination claims under both statutes is the same, this brief addresses them together. *See Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009).

discrimination. The Third Circuit has held that an employee can prove pretext "by showing that the employer in the past had subjected [the employee] to unlawful discriminatory treatment." *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 347 (3d Cir. 2022). Once Mr. Boston establishes any of the discriminatory harms under *Muldrow v. City of St. Louis's* "some harm" standard – the involuntary transfers, manufactured discipline, selective enforcement, or systematic harassment – any subsequent harm rooted in discrimination is pretextual.  601 U.S. 346, 350 (2024)

The following analysis demonstrates how Mr. Boston establishes multiple independent discriminatory harms under *Muldrow's* "some harm" standard. The harms: 1) involuntary transfers to unfamiliar equipment followed by discipline, 2) fabricated write-ups that supervisors admitted being forced to issue, 3) selective enforcement of parking rules, and 4) termination during bereavement without progressive discipline, while White comparator Michael Antenucci received multiple chances. Any one of these harms independently establishes pretext.

21

## II.  THE DISTRICT COURT APPLIED THE WRONG LEGAL STANDARD UNDER MULDROW.

The District Court dismissed Mr. Boston's discrimination claim by applying a heightened adverse employment action standard that the United States Supreme Court rejected. This was an error.[2]

The Court in *Muldrow* clarified that the correct legal standard is "some harm,"[3] not materially adverse. [601 U.S. at 350]. The Supreme Court emphasized that plaintiffs need not show "the harm incurred was 'significant.' Or serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." [*Id.* at 355]. The Court rejected the heightened standards that had developed in the lower courts.

---

[2] Previously, under *McDonnell Douglas*, a discrimination plaintiff must establish a prima facie case by showing: (1) membership in a protected class; (2) qualification for the position; (3) adverse employment action (now, "some harm"); and (4) circumstances giving rise to an inference of discrimination. 411 U.S. 792, 802 (1973); *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013. The third element has been the source of confusion in lower courts, with most requiring materially adverse or significant harm to employment.

[3] Because the adverse employment action standard no longer exists, Mr. Boston refers to each of his actionable race discrimination theories as "harms" rather than adverse actions.

Unfortunately, the District Court applied the pre-*Muldrow* approach. Specifically, the District Court held that Title VII provides relief only if discrimination is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." [Appx. Vol. I, 12]. This is precisely the heightened standard *Muldrow* rejected. The District Court then dismissed Mr. Boston's transfer claims because Mr. Boston "successfully grieved this write-up and there is no evidence that he was otherwise disciplined in connection with this or any other transfer." [*Id.* at 13.]. This analysis contradicts *Muldrow*'s rejection of heightened requirements.

Under the correct *Muldrow* standard, GPI's choice to discriminatorily transfer Mr. Boston establishes a prima facie case. Mr. Boston suffered harm when GPI transferred him without justification and then disciplined him for predictable performance problems.

### A. GPI's Targeted Transfers Meet The "Some Harm" Threshold.

Mr. Boston's involuntary transfer claim presents a textbook case of race discrimination under *Muldrow*. GPI reassigned Mr. Boston – its top-performing operator – to unfamiliar machines in different departments. [Appx. Vol. II, 248:22–249:12]. Supervisor Gary Moore shut down Mr.

Boston's department and redirected him to less efficient equipment. [Appx. Vol. II, 274:17–22; 248:19-249:12]. Even when Mr. Boston's schedule and seniority entitled him to faster machines, Moore reassigned him mid-shift to inferior ones. [Appx. Vol. II, 276:06–275:1]. These reassignments had no legitimate operational purpose and directly undermined Mr. Boston's performance, leading to unwarranted discipline.

These transfers altered the what, where, and when of Mr. Boston's work, meeting *Muldrow*'s threshold for actionable harm. GPI moved Mr. Boston to unfamiliar machinery (what), placed him in different departments (where), and denied him the stability necessary for effective performance (when). [Appx. 642, ¶¶11–13]. That is all *Muldrow* requires. 601 U.S. at 354.

The facts here are more compelling than in *Muldrow*. There, the employer at least claimed operational needs. *Muldrow*, at 601 U.S. at 350–51. Here, GPI offered no reason for disrupting Mr. Boston's performance. He was an experienced trainer with record-setting output. [Appx. Vol. II, 87:6–24; 664]. Yet GPI transferred him without

explanation to roles where performance naturally declined, which is evidence of pretext and discriminatory intent.

Mr. Boston also endured a broader pattern of harassment that independently altered his working conditions. Supervisors admitted to fabricating discipline, surveilled bathroom breaks, escalated minor conduct into misconduct, verbally abused Mr. Boston while inventing performance issues, denied him essential tools, and selectively enforced parking rules. [Appx. Vol. II, 292:15–293:19; 246:1–9; 242:18–244:04; 274:17–22; 667].

This systematic targeting meets *Muldrow*'s "some harm" test. The pattern of false discipline, verbal abuse, and unequal treatment altered Mr. Boston's conditions of employment. [601 U.S. at 355].

### B. GPI's Discriminatory Culture Supports An Inference Of Race-Based Intent.

A reasonable jury could find that GPI harbored discriminatory intent for each harm levied against Boston. The Third Circuit recognizes that workplace culture can establish intent, create evidence of a hostile environment, and serve as evidence of pretext. *Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 641 (3d Cir. 1993) ("The court may also consider as circumstantial evidence the atmosphere in which the

company made its employment decisions"); *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 333 (3d Cir. 1995); *Antol v. Perry*, 82 F.3d 1291, 1302 (3d Cir. 1996).

First, GPI tolerated hate symbols. A swastika was etched into a bathroom wall between departments and remained visible for months. [Appx. 643, ¶15; Appx. Vol. II, 79:19–80:07]. No employee reported it. When shown a photo, HR Manager Morrison said he would "investigate" whether it was "racially charged." [Appx. Vol. II, 80:02–22]. A jury could reasonably find that this silence reflected a culture hostile to Black employees.

Second, GPI excluded Black employees from leadership. Despite calling the plant "very diverse," Morrison admitted that no Black employees held supervisory roles. [Appx. Vol. II, 67:17–70:25]. None were promoted during Mr. Boston's five-year tenure. [Appx. Vol. II, 641 ¶2]. Courts have recognized that exclusion, supported by statistical evidence, can demonstrate a discriminatory motive. *See e.g., Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 339 ("Statistics are equally competent in proving employment discrimination.").

26

Third, GPI normalized racial slurs. Mr. Boston's coworker, Dennis, called him the N-word in front of witnesses. [Appx. Vol. II, 256:06-12, 23-257:04]. Morrison initially recommended a two-day suspension, identical to the penalty Mr. Boston received for a parking violation. [Appx. Vol. II, 644 ¶21]. Apparently, parking violations and calling a coworker the n-word warrant the same punishment at GPI. Further, coworker Taylor Steele was surprised Dennis was punished at all and testified Dennis had made racist comments before without consequence. [Appx. Vol. II, 984]. Courts recognize such toleration – *i.e.*, cultural evidence – as compelling evidence of pretext. *See e.g., Antol*, 82 F.3d at 1302 (3d Cir. 1996) ("The atmosphere is relevant to whether defendant's asserted legitimate non-discriminatory reasons were pretextual, and relevant to the ultimate issue of whether defendant intentionally discriminated against plaintiff.").

Lastly, replacing an employee with another employee outside of his protective class is sufficient to support an inference of discrimination. *Grabosky v. Tammac Corp.*, 127 F. Supp. 2d 610, 620 (M.D. Pa. 2000) ("replacement by a person outside the protected class may support an inference of discrimination."). GPI replaced Mr. Boston with Doug

Detweiler, a White male.  Appx. Vol. II, 644 ¶23. Therefore, inferences of discrimination are established for the harms that Mr. Boston suffered.

Together, these facts reveal a workplace where the mistreatment of Black employees was normalized. This culture helps explain the specific harms Mr. Boston faced and strengthens the inference of a discriminatory motive.

## III.   GPI'S SHIFTING AND IMPLAUSIBLE EXPLANATIONS CONFIRM PRETEXT

GPI offers no legitimate explanations for most of the harms that Mr. Boston suffered.

### A. GPI Offered No Business Reason For Mr. Boston's Involuntary Transfers.

GPI had no legitimate reasons for transferring Mr. Boston. GPI reassigned Mr. Boston to unfamiliar equipment without justification, then disciplined him for poor performance. [Appx. Vol. II, 248:22–249:12, 274:17–22]. GPI produced no documentation explaining these decisions. This absence of evidence supports pretext. *Phillips v. Starbucks Corp.*, 624 F. Supp. 3d 530, 545 (D.N.J. 2022) ("an employer's lack of documentation about the plaintiff's poor performance is evidence of pretext."). Mr. Boston's record-setting performance underscores the

implausibility of GPI's position. [Appx. Vol. II, 644 ¶22; 664]. Courts scrutinize subjective justifications closely. *See Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 320; *see also Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990) ("Subjective evaluations are more susceptible of abuse and more likely to mask pretext.") (citations and internal quotations omitted)).

### B. GPI Failed To Justify Its Other Actions Against Mr. Boston.

Any of GPI's purported explanations collapse when viewed in context. Mr. Boston was:

- Disciplined based on fabricated write-ups. [Appx. Vol. II, 292:15–293:19].

- Verbally abused and accused of misconduct for asking clarifying questions. [Appx. Vol. II, 242:18–244:04].

- Denied forklift access despite certification. [Appx. Vol. II, 407:14–409:7].

- Suspended for parking where others parked without consequence. [Appx. Vol. II, 267:10–269:5; 644 ¶¶20–21]

29

Supervisors admitted to targeting Mr. Boston at the direction of Gary Moore. [Appx. Vol. II, 988; Appx. Vol. II, 292:15-293:19; 988]. GPI's own investigations disproved performance-related allegations. [Appx. Vol. II, 243:21–244:13; 704].

Even where Mr. Boston prevailed through grievances, *Muldrow* indicates that the burden of defending oneself against false allegations can itself be harm. [601 U.S. at 355].

## IV. GPI'S PROVIDED REASONS FOR THE HARMS MR. BOSTON SUFFERED ARE ALL PRETEXTUAL

GPI's stated reasons for disciplining Mr. Boston do not withstand scrutiny. The Court must "look at the totality of the circumstances to determine whether an employer's proffered nondiscriminatory reason is pretext for a discriminatory motive." *Canada*, 49 F.4th at 347. A reasonable jury could find them unworthy of belief and infer that race more likely motivated GPI's actions. *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).

GPI offered no business justification for key actions. GPI reassigned Mr. Boston to unfamiliar equipment with no explanation, then disciplined him for slow production. [Appx. Vol. II, 248:22–249:12, 274:17–22]. There is no record of any operational need for the transfer.

*Phillips*, 624 F. Supp. 3d at 545 (denying summary judgment where employer offered no documentation of performance issues and failed to identify specific deficiencies). Mr. Boston, by contrast, was one of the company's top performers. [Appx. Vol. II, 287:6–24].

GPI fabricated and later withdrew disciplinary actions, which demonstrates shifting reasons for discipline. *Abramson v. William Paterson College*, 260 F.3d 265, 284 (3d Cir. 2001) ("[T]he ever-changing nature" of a company's reasons "detract[s] from their legitimacy."). Manager Matt McMenamin admitted supervisors were pressured by Gary Moore to write Mr. Boston up for conduct that did not warrant discipline. [Appx. Vol. II, 292:15–293:19; Appx. Vol. II, 988]. Mr. Boston successfully grieved multiple false write-ups, and GPI often rescinded them after investigation. [Appx. Vol. II, 241:8–244:13; 704].

GPI selectively enforced policies. *Branch v. Temple University*, 554 F. Supp. 3d 642, 653-54 (E.D. Pa. 2021) (selective enforcement is evidence of pretext). GPI suspended Mr. Boston for parking violations, while other employees who parked in restricted areas faced no consequences. [Appx. Vol. II, 267:10–269:5; 644 ¶¶20–21; 667–669]. Moore denied Mr. Boston

access to a forklift required for his job, despite Mr. Boston's certification. [Appx. Vol. II, 407:14–409:7].

GPI violated its own progressive discipline policy, which also demonstrates pretext. Mr. Boston was terminated during bereavement leave without progressive warnings, in violation of policy. [Appx. Vol. II, 230:17–24; 644 ¶24]. HR admitted discomfort with the timing but approved the termination anyway. [Appx. Vol. II, 650, 653].

GPI's own investigation contradicted its stated reasons. After Moore accused Mr. Boston of slow machine operation, internal review showed the performance issue was false. [Appx. Vol. II, 243:21–244:13; 704]. Because GPI's explanation for disciplining Boston was false, there is evidence of pretext. *Tomasso v. Boeing Co.*, 445 F.3d 702, 710 (3d Cir. 2006) (finding that plaintiff can show pretext by casting doubt on defendant's primary explanations).

Lastly, the district court dismissed statistical evidence, but the fact that there were 1,800 days with zero Black promotions speaks for itself. In a very diverse plant, this pattern transcends coincidence.

### A. Mr. Boston's Termination Was The Culmination Of GPI's Discriminatory Pattern.

Mr. Boston's termination – a separate harm – has even more evidence of pretext. In addition to statistics, culture, comments, and other circumstantial evidence of pretext described above, Mr. Boston's comparator, Michal Antenucci (White), demonstrates that GPI terminating him was pretextual. Both employees accumulated sufficient attendance points to warrant termination under GPI's policy and were handled by the same HR personnel. *McClain v. Pa. Dep't of Corr.*, 2011 U.S. Dist. LEXIS 73230, *25 (W.D. Pa. July 7, 2011) (comparators need only engage in acts of "comparable seriousness").

Despite identical violations, GPI treated these two employees differently. Antenucci received a Last Chance Agreement in August 2019, then additional opportunities when he violated that agreement, and was not terminated until December 2019. [Appx. Vol. II, 657-658; 129:14-130:14]. GPI terminated Mr. Boston while on bereavement leave following his brother's murder without any leniency. [Appx. Vol. II, 644 ¶24]. HR Coordinator Bender admitted, "I do not like that all of this is coming about with the death of his brother," yet proceeded with

33

termination while hoping that Mr. Boston would not file another grievance. [Appx. Vol. II, 650, 653].

## B. GPI's Other Purported Comparators Fail

GPI's attempts to detract from the legitimacy of the only relevant and similarly-situated comparator by pointing to other minorities that received lenient treatment. GPI is wrong. First, GPI cannot establish the races of its purported minority comparators with admissible evidence. These claims about employee races rely entirely on unverified interrogatory responses that are inadmissible under Federal Rule 56. *Small v. Lehman*, 98 F.3d 762, 765 n.5 (3d Cir. 1996) (finding that unsworn statements fail to meet the requirement of the rule allowing parties to support their opposition to summary judgment by affidavits). Courts cannot rely on unsubstantiated assertions about employee demographics to defeat discrimination claims.

Even if the Court were to receive this evidence, which it cannot, GPI's examples involve technical corrections, not discretionary leniency. Most employees received point reductions for supervisor errors, clocking issues, or weather emergencies that are administrative corrections that

34

differ from reaching termination thresholds. These technical fixes do not compare to the discretionary second chances given to Antenucci.

GPI cannot shield itself by pointing to minority employees who received favorable treatment. The Seventh Circuit has made clear that "a company cannot insulate itself from a finding of racial discrimination by pairing the firing of a black man with the firing of a white one, or by pointing to a token black whom it treated with abnormal leniency." *Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 931 (7th Cir. 1993).

For example, coworker Hamilton's Last Chance Agreement, which Mr. Boston anticipates GPI to trumpet, resulted from numerous notes of positive feedback from his supervisors, specifically requesting a second chance. [Appx. Vol. II, 725]. Mr. Boston, despite record-setting performance, received no such advocacy. Hamilton had different supervisors working under different HR leadership, while Boston's supervisor, Gary Moore, harbored racial animus and forced others to discipline him. [Appx. Vol. II, 292:15-293:19; 988]. The record contains no evidence about Hamilton's supervisors' racial attitudes, while Boston's supervisors' bias is documented.

Apples cannot be compared to oranges.

35

Further, GPI may point to HR Manager Morrison's race as evidence negating discrimination. But Title VII protects employees from discrimination by any supervisor or decision-maker, regardless of whether other decision-makers share the plaintiff's protected characteristics. Morrison's participation in a discriminatory system, evidenced by his refusal to acknowledge a swastika as racist, makes GPI culpable.

### C. GPI's Termination Of Mr. Boston Confirms Its Pattern Of Discriminatory Behavior.

Boston's termination was not isolated, but the culmination of the discriminatory pattern established above. Under *Canada*, this prior discriminatory treatment independently establishes that his termination was pretextual. 49 F.4th at 347 (plaintiff may show "that the employer in the past had subjected [the employee] to unlawful discriminatory treatment.") (internal citations and quotations omitted)).

The timing makes the pretext undeniable. GPI terminated Boston while he grieved his brother's violent murder without the progressive discipline warnings its policy required and without the compassion shown to White comparator Antenucci. [Appx. Vol. II, 644 ¶24, 578:7-579:3; 657-658; 129:14-130:14]. HR Coordinator Bender admitted

36

discomfort with terminating him with the death of his brother yet proceeded anyway, noting that in the past he enjoyed filing grievances. [Appx. Vol. II, 650, 653].

This act – seizing on a family tragedy to fire a record-setting employee who had successfully challenged their discrimination – completed GPI's campaign. A workplace that tolerates swastikas and racial slurs revealed its true nature when it weaponized grief against its only Black employee who dared to complain. A reasonable jury could conclude that race was the but-for cause of Mr. Boston's termination.

## V.    THE DISTRICT COURT FAILED TO CONSIDER MIXED MOTIVE.

The District Court's mechanical application of *McDonnell Douglas* also failed to consider mixed-motive liability under Title VII. As Justice Thomas recently observed in *Ames*, "a plaintiff could prevail even if the employer's stated reason was part of the reason for the employer's action." 145 S. Ct. at 1554 (Thomas, J., concurring).

Here, the record demonstrates that discriminatory animus was at least a motivating factor in his termination. This error is prejudicial given that Mr. Boston need not prove discrimination was the but-for cause of his termination, only that it was a motivating factor. The

37

evidence of racial animus (swastika, n-word), retaliatory comments, and disparate treatment (Antenucci's multiple chances) satisfies this standard.

## VI. MR. BOSTON'S HOSTILE WORK ENVIRONMENT CLAIMS SURVIVE UNDER TRADITIONAL AND MULDROW STANDARDS.

The discriminatory workplace culture detailed above created a hostile work environment under any standard. To establish a hostile work environment claim, a plaintiff must show that the workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently "severe or pervasive" to alter the conditions of the victim's employment. *Castleberry v. STI Group*, 863 F.3d 259, 264 (3d Cir. 2017). This standard is disjunctive; either severity or pervasiveness suffices. [*Id.*].

### A. The Severity Of The Discriminatory Incidents Mr. Boston Experienced Establishes GPI As A Hostile Work Environment.

The work environment GPI created was severe. Mr. Boston experienced two of the most severe forms of workplace harassment recognized by federal courts: a coworker called him the N-word, and a

swastika[4] remained carved in the bathroom that he was forced to view. [Appx. Vol. II, 643 ¶15, 79:19-80:22].

Appellate courts routinely find these incidents sufficient for hostile work environment claims. In *Castleberry*, the Third Circuit reversed dismissal where a supervisor used the N-word once, noting that even a single slur could meet the severe standard. 863 F.3d at 265. Courts consistently hold that swastikas and racial slurs in combination – or even alone – create hostile work environments. *See Castleberry*, 863 F.3d at 265 (collecting cases, notably quoting *Adams v. Austal, U.S.A.*, LLC, 754 F.3d 1240, 1254 (11th Cir. 2014) ("[A]lthough a racially offensive carving on a workplace wall was an isolated act, it was severe" enough that a "reasonable jury could find that [plaintiff's] work environment was objectively hostile")).

---

[4] While the swastika is most commonly associated with antisemitism and the Holocaust, it has equally threatening significance for Black Americans as a symbol adopted by neo-Nazi and White supremacist groups in the United States. These groups explicitly target Black people alongside Jewish people in their ideology of racial hatred. The swastika's presence in an American workplace signals not just historical antisemitism, but active contemporary racial hostility toward all minority groups.

**B. The Pervasive Pattern Of Daily Harassment That Mr. Boston Suffered Reinforces That Gpi Is A Hostile Work Environment.**

Beyond these severe incidents, Boston faced pervasive harassment: scheduling conflicts during bereavement leave [Appx. Vol. II, 294:24-295:21], bathroom surveillance by managers [Appx. Vol. II, 245:24-247:6], systematic targeting that left few Black employees remaining [Appx. Vol. II, 251:24-252:8; 641 ¶2], and Morrison telling him to "document everything and nothing else" rather than investigate his complaints [Appx. Vol. II, 641 ¶4]. Combined with the systematic discipline and transfers detailed above, this created pervasive harassment affecting every aspect of Boston's work.

**C. Mr. Boston's Hostile Work Environment Claim Must Survive Under Muldrow.**

Mr. Boston's hostile work environment claim must survive under *Muldrow*. Even under traditional standards, Mr. Boston's claim succeeds, but *Muldrow* provides additional support. *Muldrow* clarified that Title VII prohibits any discriminatory action causing "some harm" to employment conditions, rejecting requirements that harm be "significant," "serious," or "substantial." [601 U.S. at 355-56]. GPI's

40

culture caused Boston to work in an environment where discrimination went unremedied, which is precisely what Title VII prohibits.

### D. GPI Cannot Invoke The Ellerth Defense.

Under *Muldrow*, supervisors who cause "some harm" through harassment trigger strict liability, foreclosing the *Ellerth* defense. *Muldrow*, 601 U.S. at 355-56; *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765-766. Supervisor Gary Moore caused "some harm" by reassigning Boston without justification, pressuring managers to issue fabricated write-ups, verbally berating him with profanity, denying essential equipment, and contributing to his termination. [Appx. Vol. II, 292:15-293:19, 242:18-245:05, 407:14-408:8; 988].

Even if the defense applied, GPI cannot satisfy either prong. An employer must show it "exercised reasonable care to avoid harassment and to eliminate it when it might occur" and that the plaintiff "failed to act with like reasonable care to take advantage of the employer's safeguards." *Minarsky Susquehanna Cnty.*, 895 F.3d 303, 306 n.1 (3d Cir. 2018).

First, GPI failed to exercise reasonable care. A swastika remained carved in the bathroom where managers walked daily, yet GPI never

41

removed it. [Appx. Vol. II, 80:8-80:22; 643 ¶15]. When shown the photograph, HR Manager Morrison refused to acknowledge it was racist. [Appx. Vol. II, 80:02-22].

Further, following the N-word incident, GPI failed to implement any remedial measures. Morrison could not recall any additional training on discrimination or increased efforts to prevent harassment after the incident. [Appx. Vol. II 105:1-106:4]. Management kept details of the racial slur confined to director-level and above, while Morrison deflected responsibility, claiming HR "cannot control human beings." [104:17-20; 106:8-13]. Had GPI properly investigated, it would have discovered that coworker Taylor Steele knew Dennis had made derogatory racial comments before, confirming Dennis had done this before. [Appx. Vol. II, 985-987]. This testimony confirms GPI took no proactive steps to address the hostile work environment or prevent future racial harassment.

Second, Mr. Boston acted reasonably. He reported racial harassment to Morrison, who told him to "document everything and nothing else," which effectively shut down GPI's reporting system. [Appx. Vol. II, 641 ¶4]. Mr. Boston followed these instructions, documenting the swastika with a photograph rather than making futile reports. His

42

decision not to report what managers already walked past daily was objectively reasonable given GPI's demonstrated hostility to his complaints.

This test is not disjunctive; GPI cannot demonstrate that no reasonable jury could find that GPI did not meet its burden for its affirmative defense.

## VII. MR. BOSTON'S RETALIATION CLAIMS SURVIVE UNDER THE CORRECT LEGAL STANDARD.

The District Court applied the wrong legal standard and ignored direct evidence of retaliatory animus. Third Circuit precedent requires only a "pattern of antagonism." *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997). More fundamentally, the District Court overlooked direct evidence of retaliatory intent and a systematic escalation of targeting following Mr. Boston's protected complaints.

### A. GPI's Decision-Makers Attested To Having And Witnessing Direct Retaliatory Intent.

HR Coordinator Bender's own words demonstrate retaliatory animus. When terminating Mr. Boston, Bender noted the timing of his brother's death and that in the past he enjoyed filing grievances, hoping he would not challenge the termination. [Appx. Vol. II, 650, 653]. Her

43

characterization confirms Mr. Boston's testimony that GPI's strategy was to write him up excessively, knowing that even if he won grievances, the volume would be so overwhelming that he could not get all the write-ups thrown out. [Appx. Vol. II, 250:22-251:9].

Mr. Boston's testimony reveals GPI's systematic retaliation strategy. When GPI could no longer sustain work-related discipline because Mr. Boston kept winning grievances, "it escalated to out-of-work things" like parking violations. [Appx. Vol. II, 268:14-18]. When that failed, GPI shifted to attendance points where they could deny progressive discipline protections and circumvent the grievance process.

### B. The Record Establishes That GPI Showed A Clear Pattern Of Escalating Antagonism Toward Mr. Boston.

Mr. Boston made two protected complaints that triggered immediate retaliation. First, approximately one year before April 2020, Mr. Boston complained that Moore, Dennis, and Nonamaker were harassing him because he is Black. [Appx. Vol. II, 641 ¶4]. Second, on April 29, 2020, Mr. Boston escalated his complaints by reporting Dennis's use of the N-word. [Appx. 642 ¶5].

Disciplinary escalation followed each protected complaint. After the first complaint, GPI initiated targeting through Moore's verbal abuse and

44

fabricated performance write-ups in August-September 2019. [Appx. Vol. II, 292:15–293:19; 246:1–9; 242:18–244:04; 274:17–22; 667]. Following the April 2020 N-word complaint, GPI launched more discipline: final written warning (May 2020), multiple attendance warnings (August 2020-April 2021), suspension for parking (May 2021), and termination (June 2021). [Appx. Vol. II, 667; 671; 675; 677].

Management coordination proves systematic targeting. Multiple supervisors admitted Moore forced them to discipline Mr. Boston for minor infractions, showing Mr. Boston emails proving complaints would come from Moore. [Appx. Vol. II, 292:15-293:19; 988]. Mr. Boston successfully grieved numerous disciplines, confirming they lacked merit, yet GPI continued the pattern until terminating him on attendance points where grievances were unavailable.

GPI deliberately circumvented progressive discipline requirements. Despite policy requiring progressive warnings before termination, GPI provided Mr. Boston no notice of his attendance status before firing him during his brother's bereavement. [Appx. Vol. II, 578:7-579:3; 652]. This deviation from standard procedure demonstrates intent to avoid giving Mr. Boston an opportunity to address attendance issues.

45

The timeline demonstrates the material issues of fact:

## RETALIATORY ESCALATION FOLLOWING PROTECTED ACTIVITY

| Date | Event | Type | Result |
|---|---|---|---|
| ~2019 | Boston reports racial harassment to Morrison | Protected Activity #1 | Morrison: "document everything" [Appx. 641 ¶4] |
| Apr. 29, 2020 | Boston reports n-word incident | Protected Activity #2 | Boston complaint about Dennis. [Appx. Vol. II, 655] |
| May-2020 | Targeted for sheeting rolls at the incorrect size. | Work Performance | [Appx. Vol. II, 678] |
| May-2020 | Targeted for working too slow | Final Written Warning | [Appx. Vol. II, 677] |
| Aug. 2020 | Attendance | Point Issued | [Appx. Vol. II, 675] |
| Nov. 23, 2020 | Showed up for jury duty (courthouse closed for COVID) | Civic Duty/Attendance Point | Grieved but point upheld [Appx. Vol. II, 370:5-373:5 388:2-389:3; 673] |
| Dec. 19, 2020 | Grandmother funeral - called out Saturday OT | Bereavement/Attendance Point | [Appx. Vol. II, 379:10-381:12; 378:1-379:16, 295:1-21; 672] |

| Feb. 2021 | Targeted for not verifying pick list | Final Written Warning | [Appx. Vol. II, 671] |
|---|---|---|---|
| Mar. 2021 | Morrison asks about Boston's Mercedes | Surveillance | Shift to personal [Appx. Vol. II, 659] |
| Mar-2021 | Consultation for taking too many breaks | Work performance | [Appx. Vol. II, 670] |
| April-2021 | Attendance | Moore gives attendance point | [Appx. Vol. II, 666] |
| 11-May-21 | 2-day suspension | Parking Violation | [Appx. Vol. II, 644 ¶¶20-21; 667] |
| May or Jun-2021 | Brother murdered | Personal Tragedy | No accommodation [Appx. Vol. II, 644 ¶24] |
| May-2021 | Further absences around brother's murder | Attendance | No progressive discipline. [Appx. Vol. II, 578:7-579:3; 652; 644 ¶24] |
| Jun-2021 | TERMINATION | Bender: grievance happy | No pay for holiday, and while on bereavement leave. [Appx. Vol. II, 650] |

## C. The Evidence Creates Genuine Issues Of Material Fact.

The record establishes retaliation through multiple avenues: (1) Bender's direct admissions of retaliatory animus; (2) the compressed

timeline from protected complaints to termination; (3) management coordination evidenced by supervisors' admissions; (4) the strategic shift from grievable work discipline to attendance points; and (5) deliberate circumvention of progressive discipline requirements.

Under the correct legal standard, this evidence satisfies the "pattern of antagonism" requirement. The Third Circuit emphasizes that "proffered evidence, looked at as a whole, may suffice to raise the inference" of retaliation. *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017). Mr. Boston's retaliation claims require reversal and remand for trial.

### D. GPI's Stated Reasons For Mr. Boston's Termination Are Pretextual.

GPI's attendance explanation collapses under the weight of retaliatory animus. Bender's own words – that is, Mr. Boston enjoyed filing grievances and she hoped he would not this time around – reveal the true motive. [Appx. Vol. II, 650, 653]. Combined with GPI's strategic shift from grievable work discipline to attendance points and deliberate circumvention of progressive discipline requirements, Mr. Boston's termination was the culmination of systematic retaliation.

Further, all the other evidence of pretext discussed throughout this brief applies equally here. *Jenkins v. Cornerstone Relocation Grp.*, LLC, Civil Action No. 23-1755 (MAS) (JTQ), 2025 U.S. Dist. LEXIS 18058, at *36 (D.N.J. Jan. 31, 2025) ("Court's pretext inquiry for retaliation claims is identical to the analysis for disparate treatment claims" . . . and the court can rely "on its pretext analysis of Plaintiff's disparate treatment claims above.").

Mr. Boston's retaliation claim requires reversal and remand for trial.

## **CONCLUSION**

Over the course of nearly five years of employment, GPI subjected Mr. Boston to repeated instances of escalating racial discrimination. While working for GPI, Mr. Boston was called a slur by a GPI employee, dismissed by GPI management, harassed by his supervisors, frivolously written up multiple times, made to use a restroom with a swastika in it, and finally terminated for an infraction that a White employee was allowed to get away with. This is inarguably the "some harm" that *Muldrow* requires a plaintiff/appellant show to establish discrimination.

With facts that establish repeated instances of discrimination causing harm to Mr. Boston and a legal standard requiring that Mr. Boston suffer only "some harm" to establish his prima facie case, this Court should: (1) find that the District Court erred when it failed to apply the *Muldrow* "some harm" standard in this case, and (2) reverse the District Court's order granting Defendant/Appellee GPI's Motion for Summary Judgment.

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains <u>8,229</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 3d Cir. L.A.R. 32.1(b).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point <u>Century Schoolbook</u> font.

*<u>s/ Andrew Lacy, Jr.</u>*
Andrew Lacy, Jr., Esq., PA
THE LACY EMPLOYMENT LAW FIRM
*Attorney for Plaintiff-Appellant*
3675 Market Street, Suite 200
Philadelphia, PA 19104
(215) 399-9761
andrew.lacy@employment-labor-law.com

51

## **COMBINED CERTIFICATE**

I HEREBY CERTIFY as follows:

1. I am a member in good standing of the bar of the Third Circuit and the Supreme Court of the Commonwealth of Pennsylvania.

2. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and contains <u>8,229</u> words, excluding the parts exempted by Fed. R. App. P. 32(f).

3. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point <u>Century Schoolbook</u> font.

4. The text of the electronic brief is identical to the text in the paper copies.

5. A virus scan was performed on this brief using Avast One, Version 25.3.0, and no virus was detected.

6. I have this 28th day of July 2025 served a true and correct copy of this Brief via the CM/ECF system upon counsel for Appellee.

<u>*s/ Andrew Lacy, Jr.*</u>
Andrew Lacy, Jr., PA Bar No. 321232
*Attorney for Plaintiff-Appellant*

# United States Court of Appeals

*for the*

# Third Circuit

Case No. 25-1698

MAURICE BOSTON,

*Appellant,*

– v. –

GRAPHIC PACKAGING INTERNATIONAL, LLC

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA IN CASE
NO. 2:22-CV-03473, JOHN R. PADOVA, U.S. DISTRICT JUDGE

## JOINT APPENDIX
### Volume 1 of 2 (Pages A1 to A32)

BRIDGET C. DEVLIN, ESQ.
KEVIN FRANKEL, ESQ.
BARBARA R. RIGO, ESQ.
LITTLER MENDELSON P.C.
*Attorneys for Defendant-Appellee*
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA 19102
(267) 402-3000
bdevlin@littler.com
kfrankel@littler.com
brigo@littler.com

ANDREW LACY, JR., ESQ.
THE LACY EMPLOYMENT LAW FIRM
*Attorney for Plaintiff-Appellant*
3675 Market Street, Suite 200
Philadelphia, PA 19104
(215) 399-9761
andrew.lacy@employment-labor-law.com

CP COUNSEL PRESS    (800) 4-APPEAL • (813248)

# JOINT APPENDIX
## Volume I of II

**Page:**

**Amended Notice of Appeal [E.D. Pa. 60]**
   **filed April 17, 2025** ....................................................................................**A1**

**Notice of Appeal [E.D. Pa. 58]**
   **filed April 10, 2025** ....................................................................................**A2**

**Order being appealed:**
**Order granting Motion for Summary Judgment [E.D. Pa. 57]**
   **filed March 24, 2025** ..................................................................................**A4**

**Opinion under review:**
**Memorandum [E.D. Pa. 56]**
   **filed March 24, 2025** ..................................................................................**A6**

**JOINT APPENDIX**
**Volume II of II Part 1**

Page:

**Docket Entries**.................................................................................. D1

**Deposition of Kevin Morrison [E.D. Pa. 36-2]**
    taken October 6, 2023 ...................................................................A33

**Deposition of Robin Bender [E.D. Pa. 36-4]**
    taken September 29, 2023 ...........................................................A144

**Deposition of Maurice Boston [E.D. Pa. 36-5]**
    taken January 30, 2023.................................................................A203

**Deposition of Maurice Boston**
    taken August 23, 2023 ................................................................A325

ii

## JOINT APPENDIX
### Volume II of II Part 2

Page:

Deposition of Robert Gabe [E.D. Pa. 36-6]
    taken April 6, 2023 ...............................................................................A551

Declaration of Maurice Boston [E.D. Pa. 36-3]
    sworn January 10, 204................................................................A641

Email Amongst Hammell [E.D. Pa. 36-8] ....................................A646

Supplemental Email [E.D. Pa. 36-11] ...........................................A649

Complaint Regarding Dennis [E.D. Pa. 36-12] ...........................A655

Atenucci Attendance Work Down [E.D. Pa. 36-13] ...................A656

Morrison Text Regarding Car [E.D. Pa. 36-14] ..........................A659

October 3, 2023 Follow-Up [E.D. Pa. 36-15] ...............................A660

Boston Production Numbers [E.D. Pa. 36-16] ............................A665

Boston Discipline History and Grievance [E.D. Pa. 36-17] .....................A666

Proposed Supplemental Reply Brief Attachment [E.D. Pa. 48-1] .........A707

Complaint [E.D. Pa. 1]
    filed August 30, 2022 ......................................................................A738

Deposition of Gary Moore
    taken October 24, 2023 ...................................................................A747

Attendance Policy
       dated May 2, 2011........................................................................A798


**Collective Bargaining Agreement Between Graphic Packaging
International, Inc. and United Steel, Paper and Forestry, Rubber,
Manufacturing, Energy, Allied Industrial and Service Workers
International Union, AFL-CIO-CLC**...........................................A803


**Memorandum of Understanding By and Between Graphic
Packaging International Valley Forge Folding Carton and
USW and its Local #807 - Material Handler**.................................A840


**Memorandum of Understanding By and Between Graphic
Packaging International Valley Forge Folding Carton and
USW and its Local #807 - Valley Forge Twelve (12) Hours
Continuous Operations**.................................................................A841


**Memorandum of Understanding By and Between Graphic
Packaging International Valley Forge Folding Carton and
USW and its Local #807 - Holidays Worked** ................................A842


**Memorandum of Understanding By and Between Graphic
Packaging International Valley Forge Folding Carton and
USW and its Local #807 - Saturday and Sunday Overtime**.....................A843


**Memorandum of Understanding By and Between Graphic
Packaging International and United Steel Workers
Local Union #807** ........................................................................A844


**Memorandum of Understanding By and Between Graphic
Packaging International Valley Forge Facility and Allied
Industrial International and Service Workers International
USW and its Local #807 - Addition of Line of Progression
Role in Sheeting: Sheeter Helper/Rollstand Operator** ...........................A845

**Graphic Packaging International, Inc.**
**Witness Interview Summary Form**.......................................................A846

**Suspension Notice to Dennis William**
       dated April 30, 2020 ....................................................A849

**Witness Statement of Dennis William**
       dated April 29, 2020 ....................................................A850

**Witness Statement of Centell Berry**
       dated April 29, 2020 ....................................................A851

**Witness Statement of Taylor Steel**
       dated April 29, 2020 ....................................................A852

**Witness Statement of Josh Berry**
       dated April 29, 2020 ....................................................A853

**Declaration of Robert Gabe**
       sworn December 8, 2023 ................................................A854

**Maurice Boston Attendance Sheet**...............................................A856

**Graphic Packaging International, Inc. Policy Handbook for**
**Salaried and Non-Union Hourly Employees** ..............................A857

**Grievance Response #0612021 - Termination of Maurice Boston**..........A860

**Declaration of Gary Moore**
       sworn December 13, 2023 ..............................................A861

**Timesheet of Maurice Boston**......................................................A863

**Email Thread Re: Maurice Boston** ...............................................A865

SMS Screenshots ......................................................................A866

Maurice Boston Attendance Sheet - 12/21/16 .............................................A868

List of Terminated Employees .................................................A869

Defendant's Brief In Support Of
Its Motion For Summary Judgment [E.D. Pa. 30-3] ...................................A870

Proposed Reply Brief In Further Support Of
Defendant's Motion For Summary Judgment [E.D. Pa. 42]
       filed February 8, 2024.......................................................A906

Plaintiff's Motion To File A Surreply [E.D. Pa. 38]
       filed February 7, 2024.......................................................A918

Plaintiff's Response In Opposition To
Defendant's Motion For Summary Judgment [E.D. Pa. 36]
       filed January 11, 2024.......................................................A942

Slip Sheet for Steele Video at 1:54–2:05 ......................................A984

Slip Sheet for Steele Video at 3:54–4:08 ......................................A985

Slip Sheet for Steele Video at 4:13–4:18 ......................................A986

Slip Sheet for Steele Video at 4:22–4:26 ......................................A987

Slip Sheet for Moore Video at 3:47–3:50 ......................................A988

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

**MAURICE BOSTON**

    Plaintiff,

                                      Civil Action No. **2:22-CV-03473**

    v.

**GRAPHIC PACKAGING**
**INTERNATIONAL, LLC,**

    Defendant.
_____

## AMENDED NOTICE OF APPEAL

Notice is hereby given that Maurice Boston, Plaintiff in the above-named case, hereby appeals to the United States Court of Appeals for the Third Circuit from the final judgment entered in this action on March 24, 2025, ECF No. 57 and issued an accompanying memorandum as well, ECF No. 56, in favor of Defendant Graphic Packaging International, LLC.

This Amended Notice of Appeal supersedes and replaces the Notice of Appeal previously filed and is being filed to correct the identity of the plaintiff and defendant in this matter.

Dated: April 17, 2025                             Respectfully submitted,

                                          _/s/ Andrew Lacy, Jr._
                                          Andrew Lacy, Jr. Esq.
                                          Austin D. Skelton, Esq.
                                          **THE LACY EMPLOYMENT**
                                          **LAW FIRM LLC**
                                          3675 Market Street, Suite 200
                                          Philadelphia, PA19104
                                          (t) 412-301-3908
                                          andrew.lacy@employment-labor-law
                                          .com

                                          _Counsel for Plaintiff_

A001

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MAURICE BOSTON**, | : | |
| Plaintiff, | : | |
| | : | **Civil Action No. 2:22-cv-03473** |
| v. | : | |
| | : | |
| **SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY (SEPTA)**, | : | |
| Defendant. | : | |

### NOTICE OF APPEAL

Notice is hereby given that Maurice Boston, Plaintiff in the above-named case, hereby appeals to the United States Court of Appeals for the Third Circuit from the final judgment entered in this action on March 24, 2025, ECF No. 57 and issued an accompanying memorandum as well, ECF No. 56.

Dated: April 10, 2025

Respectfully submitted,

*/s/ Andrew Lacy, Jr.*
Andrew Lacy, Jr. Esq.
Austin D. Skelton, Esq.
**THE LACY EMPLOYMENT LAW FIRM LLC**
3675 Market Street, Suite 200
Philadelphia, PA 19104
(t) 412-301-3908
andrew.lacy@employment-labor-law.com

*Counsel for Plaintiff*

A001.A

**CERTIFICATE OF SERVICE**

Plaintiff certifies that the foregoing was served upon counsel listed on the Court's ECF

system via electronic mail:

James Y. Lee
jameslee@littler.com
Barbara Ritter Rigo
brigo@littler.com
**LITTLER MENDELSON P.C**
1601 Cherry Street, Unit 1400
Philadelphia, PA 19102
(267) 402-3000

Richard R. Harris
Richard.Harris@hklaw.com
**HOLLAND & NIGHT LLP**
1650 Market Street, Suite 3300
Philadelphia, PA 19103
(215) 252-9600

*Attorneys for Defendant*

Dated: April 10,  2025

*/s/ Andrew Lacy, Jr.*
Andrew Lacy, Jr. Esq.
Austin D. Skelton, Esq.
**THE LACY EMPLOYMENT
LAW FIRM LLC**
3675 Market Street, Suite 200
Philadelphia, PA19104
(t) 412-301-3908
andrew.lacy@employment-labor-law
.com

*Counsel for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MAURICE BOSTON                :          CIVIL ACTION
                                  :
v.                         :
                                  :
GRAPHIC PACKAGING       :
INTERNATIONAL, LLC       :          NO.  22-3473

## <u>ORDER</u>

**AND NOW**, this 24th day of March, 2025, upon consideration of Defendant's Motion for Summary Judgment (Docket No. 30), all documents filed in connection therewith, and the Hearing held on January 13, 2025, and for the reasons stated in the accompanying Memorandum, **IT IS HEREBY ORDERED** that the Motion is **GRANTED**.  **IT IS FURTHER ORDERED** that **JUDGMENT** is entered in favor of Defendant Graphic Packaging International, LLC and against Plaintiff Maurice Boston.  The Clerk of Court is directed to **CLOSE** this case.

BY THE COURT:

/s/ John R. Padova

_____

John R. Padova, J.

A002

## <u>CERTIFICATE OF SERVICE</u>

Plaintiff certifies that the foregoing was served upon counsel listed on the Court's ECF system via electronic mail:

Barbara Rittinger Rigo, Bar No. 76630
brigo@littler.com
Bridget C. Devlin, Bar No. 328516
bdevlin@littler.com
**LITTLER MENDELSON, P.C.**
Three Parkway 1601 Cherry Street, Suite 1400
Philadelphia, PA 19102.1321
Telephone: 267.402.3000
Facsimile: 267.402.3131
*Attorneys for Graphic Packaging International, LLC*

Respectfully submitted,

Dated: April 17, 2025

<u>*/s/ Andrew Lacy, Jr.*</u>
Andrew Lacy, Jr. Esq.
Austin D. Skelton, Esq.
**THE LACY EMPLOYMENT
LAW FIRM LLC**
3675 Market Street, Suite 200
Philadelphia, PA19104
(t) 412-301-3908
andrew.lacy@employment-labor-law
.com

*Counsel for Plaintiff*

A003

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MAURICE BOSTON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| GRAPHIC PACKAGING | : | |
| INTERNATIONAL, LLC | : | NO.  22-3473 |

**MEMORANDUM**

**Padova, J.**                                                                                       **March  24,  2025**

Plaintiff Maurice Boston brought this action against his former employer, Graphic Packaging International, LLC ("GPI"), after GPI terminated his employment.  Plaintiff contends that he was terminated and otherwise discriminated against by GPI because of his race in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.  GPI has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.  For the following reasons, we grant the Motion and enter judgment in favor of GPI.

**I.      BACKGROUND**

The record evidence shows that GPI "manufactures paperboard packaging used to package consumer goods."  (Moore Decl. (GPI Ex. O) at APPX 0483 ¶ 3.)  GPI has a facility near Valley Forge, Pennsylvania that transforms paperboard into consumer packaging products.  (Id. ¶ 4.)  That facility employs 175 full-time employees.  (Id. ¶ 5.)  GPI first hired Plaintiff, who is African American, as a Sheeter Operator on a temporary basis on December 21, 2016.  (Id. ¶ 6; Boston Dep. Vol. 2 (GPI Ex. D), Ex. 4 at APPX 0202.)  Plaintiff became a full-time employee and member of the union after 90 days.  (Moore Decl. ¶ 6.)  Plaintiff's job was located at the Valley Forge plant, where Plaintiff primarily worked the night shift.  (Boston Dep. Vol. 2, Ex. 4

A004

at APPX 0175; Moore Decl. ¶ 6.)  His employment with GPI was terminated by letter dated June 3, 2021.  (Boston Dep. Vol. 2 at 261; Boston Dep. Vol. 1 (GPI Ex. H) at APPX 0307.)  The reason given for his termination was that Plaintiff had too many "attendance points."  (Boston Dep. Vol. 2 at 261; Boston Dep. Vol. 1 at APPX 0307.)

GPI's attendance policy applies to all of its hourly employees working at the Valley Forge plant.  (GPI Ex. C ¶ 2.2.1.)  Under the attendance policy, employees are given attendance occurrence points ("attendance points") for a full day unexcused absence (1 point); being tardy (1/2 point for less than 2 hours late, 1 point for more than two hours late); leaving early (1 point); failure to clock in or out (1/2 point); and being AWOL or calling in more than two hours late (four points).  (Id. ¶ 3.1.2.)  The policy also requires employees to notify GPI at least 30 minutes before the start of their shift if they will not be at work at their scheduled start time and a failure to do so results in an attendance point.  (Id. ¶ 3.2.3.)  Therefore, an employee who is late and does not notify GPI at least 30 minutes before the start of their shift will receive one and 1/2 attendance points, 1/2 point for being tardy and one point for the call-in violation.  (Id. ¶ 3.2.4.)  An employee will be terminated if they accumulate nine points.  (Id. ¶ 3.5.1.)  If an employee has perfect attendance for sixty days, one point is deducted from their total.  (Id. ¶ 3.1.3.)  Approved absences, including approved vacation time, funeral leave, short term disability, FMLA leave, and weather emergency, are excused and do not result in attendance points.  (Id. ¶ 3.1.4.)  If an employee is absent for consecutive days due to the same illness and has medical documentation, only one attendance point is charged for the illness, no matter how many consecutive days are missed.  (Id. ¶ 3.3.1.)  If the employee does not provide medical documentation, the employee may receive attendance points for each day absent.  (Id.)

Robin Bender was the Human Resources Coordinator for GPI who notified Plaintiff that he was being terminated for accrual of more than nine attendance points. (Boston Dep. Vol. 1 at APPX 0307.) The termination letter that she sent him on June 3, 2021 states the reason for his termination as follows:

> On May 6, May 7, May 17, and May 29 you incurred one (1) attendance point[] for each day when you failed to report to work as scheduled in addition to calling out late (l attendance point) and a late arrival (/5 attendance points). This makes the total number of attendance points you have incurred as of May 29, 2021 10.5, which warrants immediate termination under the Valley Forge Attendance Policy. Therefore, your employment at Graphic Packaging International terminated on May 29, 2021.

(Id.) Plaintiff had a total of three attendance occurrence points in February 2021 and accumulated an additional 7.5 attendance points between March and May 2021 as follows: one point for an absence on March 20, 2021; one point for an absence on April 17, 2021; one point for an absence on May 6, 2021; one point for a late call out on May 6, 2021; one point for an absence on May 7, 2021; one point for an absence on May 17, 2021, 1/2 point for being late on May 24, 2021, and one point for an absence on May 29, 2021. (Moore Decl. Ex. D at APPX 0490.)

During the same time frame in which he incurred the 7.5 attendance points listed above, Plaintiff was also disciplined for other conduct. On May 11, 2021, he was suspended for two days for parking in a handicapped space and for parking in a different unauthorized spot when he was asked to move his car. (Boston Dep. Vol. 2 at 240-41; id., Ex. 4 at APPX 0130-32; Pl. Ex. 12 at Supp_GPI_Boston 0000190.) Plaintiff had also parked in the handicapped space on three or four other occasions. (Boston Dep. Vol. 2 at 247.)

During his employment at GPI, Plaintiff also encountered racism. Specifically, on April 29, 2020, a GPI employee, William Dennis, referred to Plaintiff using the "N-word". (GPI Ex. J

3

at APPX 0400, 0403.)  On that date,  Mr. Dennis and Taylor Steel, another employee, were setting up rolls on a machine and noticed Plaintiff, who had used the machine the night before, had set up the rolls improperly.  (Id. at APPX 0400-01, 0403-04.)  Mr. Dennis said to Mr. Steel: "I can't believe that nigger did this."  (Id. at APPX 0400)  Although Plaintiff was not present when Mr. Dennis made this statement, Mr. Steel and another employee were both present and heard the statement.  (Boston Dep. Vol. 1 at 54; GPI Ex. J at APPX 0401.)  Mr. Steel told his supervisor Wayne Nonamaker.  (GPI Ex. J at APPX 0401, 0403.)   Mr. Dennis, who is Caucasian, worked on the same machine as Plaintiff and they were the same level employee. (GPI Ex. J at APPX 0404; Boston Dep. Vol. 1 (Pl. Ex. 1.D.) at 73-74, Vol. 2 at 224; Joint Concise Statement of Stipulated Facts ¶¶ 29-30.)  Plaintiff heard about Mr. Dennis's remark and sent an April 29, 2020 email to Kevin Morrison, who was then GPI's Human Resources Manager, stating:  "I'm hearing that my coworker William Dennis used a racial slur when referring to me in front of 2 other coworkers.  I hope that you guys are taking this seriously, because I'm taking this EXTREMELY serious!!!!!!"  (Boston Dep. Vol. 2 at APPX 0087, 0091.) Mr. Morrison responded by email the next day, stating that GPI was aware of the issue, had begun an investigation and "[took] these situations very seriously."  (Id. at APPX 0091.)  Mr. Morrison conducted an investigation and, on April 30, 2020, suspended Mr. Dennis for two days. (GPI Ex. J at APPX 0403.)  GPI's Director of Human Resources reviewed the investigation and, on May 4, 2020, instructed Mr. Morrison to convert Mr. Dennis's suspension to termination as of May 5, 2020.  (Def. Ex. M at APPX 0480.)

The record also contains a picture of a metal wall in a bathroom at GPI's Valley Forge plant, on which the words "FUCK GPI" and a swastika were scratched.  (Pl. Resp. at 1, Boston Decl. (Pl. Ex. 1.B) ¶ 15.)  Mr. Morrison testified at his deposition that he was not aware of any

4

GPI employee coming forward to report the profanity and swastika scratched on this wall. (Morrison Dep. at 47-48.)

Plaintiff asserts claims for race discrimination based on disparate treatment, hostile work environment and retaliation in violation of 42 U.S.C. § 1981 (Count I) and Title VII (Count II). GPI has moved for summary judgment with respect to all of Plaintiff's claims, arguing that Plaintiff has no evidence that there was a hostile work environment at GPI, or that any decisionmaker at the company took actions against him either based on his race or in retaliation for protected conduct.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id. In ruling on a summary judgment motion, we "construe the evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion." Jacobs v. Cumberland Cnty., 8 F.4th 187, 192 (3d Cir. 2021) (citing Bland v. City of Newark, 900 F.3d 77, 83 (3d Cir. 2018)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the nonmoving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the

5

A008

district court[] that there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response "must support the assertion [that a fact is genuinely disputed] by" (A) citing to particular parts of materials in the record . . . or (B) showing that the materials [that the moving party has cited] do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1).

We will grant summary judgment if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. "'While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla.'" Galli v. New Jersey Meadowlands Comm'n, 490 F.3d 265, 270 (3d Cir. 2007) (quoting Hugh v. Butler Cnty. Fam. YMCA, 418 F.3d 265, 267 (3d Cir. 2005)). However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 252 (3d Cir. 2010) (citing Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989)).

## III.   DISCUSSION

A.      Race Discrimination – Disparate Treatment

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). Section 1981 provides, in pertinent part, as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give

6

A009

evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind and to no other.

42 U.S.C. § 1981(a). "Although § 1981 does not itself use the word 'race,' the [Supreme] Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts." St. Francis Coll. v. Al-Khazraji, 481 U.S. 604, 609 (1987) (citing Runyon v. McCrary, 427 U.S. 160, 168 (1976) ). We analyze race discrimination claims brought pursuant to § 1981 under the same standard under which we analyze such discrimination claims under Title VII. Carvalho-Grevious v. Delaware State Univ., 851 F.3d 249, 256-57 (3d Cir. 2017) ("The substantive elements of a [racial discrimination] claim under § 1981 are generally identical to the elements of an employment discrimination claim under Title VII.'") (alteration in original) (quotation omitted)).

Where, as here, there is no direct evidence of discrimination, claims of race discrimination in employment are analyzed under the burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). See Kant v. Seton Hall Univ., 289 F. App'x 564, 566 (3d Cir. 2008) (citations omitted). That "framework requires that the plaintiff first establish a *prima facie* case of discrimination." Tourtellotte v. Eli Lilly & Co., 636 F. App'x 831, 842 (3d Cir. 2016). "If the plaintiff successfully meets the requirements of a prima facie case, the burden then shifts to the employer to articulate a legitimate . . . nondiscriminatory reason for its actions." Id. "If the employer produces such a reason, the burden then shifts back to the plaintiff to prove that the employer's . . . nondiscriminatory explanation is merely a pretext for the discrimination . . . ." Id. (citing McDonnell Douglas, 411 U.S. at 802-04; Atkinson v. LaFayette Coll., 460 F.3d 447, 454 (3d Cir. 2006)). To defeat a motion for summary judgment at the pretext stage "the [plaintiff] 'must point to some evidence,

7

direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" Id. (quoting Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006)).

### 1. The prima facie case

In order to establish a prima facie case of discrimination based on disparate treatment, Plaintiff must demonstrate the following: "'(1) [he] is a member of a protected class; (2) [he] was qualified for the position [he] sought to attain or retain; (3) [he] suffered an adverse employment action; and (4) *the action occurred under circumstances that give rise to an inference of intentional discrimination*.'" Qin v. Vertex, Inc., 100 F.4th 458, 473 (3d Cir. 2024) (alterations in original) (quoting Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008)). GPI argues that Plaintiff has not established a prima facie case because he cannot show that he experienced an adverse employment action under circumstances that would give rise to an inference of unlawful discrimination.

### a. adverse action

The parties agree that Plaintiff suffered an adverse action when he was terminated from his job with GPI. Plaintiff also asserts that the two-day suspension he was given for parking in an unauthorized space was an adverse employment action,[1] and that he suffered an adverse employment action when he was transferred to work on a new machine and then written-up for underperforming. The law is clear that "'Title VII and section 1981 . . . do not provide relief for

---

[1] The record evidence does not explicitly state whether Plaintiff's two-day suspension was paid. (See, e.g. Boston Dep. Vol. 2, Ex. 4 at APPX 0130-32.) Drawing all inferences in Plaintiff's favor, we assume, for the purposes of the instant Motion for Summary Judgment, that Plaintiff's suspension was unpaid. Jacobs, 8 F.4th at 192 (citing Bland, 900 F.3d at 83).

8

general unpleasantness that can occur in the workplace, even if that unpleasantness may be motivated by racial animus. Rather, those statutes provide relief only if discrimination is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" Barnees v. Nationwide Mut. Ins. Co., 598 F. App'x 86, 90 (3d Cir. 2015) (quoting Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004)) (citation omitted). "An 'adverse employment action' is 'one which is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" Hartman v. Select Rehab., LLC, 528 F. Supp. 3d 373, 383 (E.D. Pa. 2021) (quoting Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001)) The term "includes 'firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Id. (quoting Remp v. Alcon Labs., Inc., 701 F. App'x 103, 106-07 (3d Cir. 2017)). It also includes "reassigning an employee to a 'dead-end' position that was soon eliminated, . . . giving an employee a potentially less profitable sales position . . .; failing to rehire someone, and revoking a person's office, dismissing her secretary, and assigning her less work." Id. (quotation and citations omitted).

"A suspension without pay may qualify as an adverse employment action for purposes of establishing a *prima facie* case of discrimination." Friel v. Mnuchin, 474 F. Supp. 3d 673, 687 (E.D. Pa. 2020), (citation omitted), aff'd, No. 20-2714, 2021 WL 6124314 (3d Cir. Dec. 28, 2021). Accordingly, we find that the evidence of Plaintiff's two-day suspension without pay for parking in unauthorized spaces is sufficient to support a conclusion that the suspension constituted an adverse employment action for the purposes of Plaintiff's discrimination claim. "On the other hand, lateral transfers or changes in title absent evidence of a material change in an employee's working conditions generally do not constitute adverse employment actions."

Hartman, 528 F. Supp. 3d at 383 (citing Fiorentini v. William Penn Sch. Dist., 665 F. App'x 229, 234 (3d Cir. 2016); Daniels v. Sch. Dist. of Phila., 982 F. Supp. 2d 462, 479 (E.D. Pa. 2013), aff'd 776 F.3d 181 (3d Cir. 2015)). Here, Plaintiff argues that he suffered a third adverse employment action when he was transferred to a new department and then written up for underperforming. (Boston Decl. ¶ 12.) However, Plaintiff successfully grieved this write up and there is no evidence that he was otherwise disciplined in connection with this or any other transfer. (See id.) There is also no other record evidence that Plaintiff experienced any change in his working conditions when he was reassigned to work on new machines. Accordingly, we find that Plaintiff has not shown that the transfer was an adverse employment action.

b.      inference of unlawful discrimination

GPI argues that Plaintiff cannot establish a prima facie case because he cannot point to any evidence to prove the fourth element of a prima facie case, i.e., that the asserted adverse employment actions occurred "under circumstances that could give rise to an inference of intentional discrimination." Qin, 100 F.4th at 473 (quotation and emphasis omitted). To establish this element, a plaintiff "must produce 'evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion.'" Leftwich v. Lew, Civ. A. No. 15-300, 2015 WL 8773274, at *7 (E.D. Pa. Dec. 14, 2015) (quoting Kier v. F. Lackland & Sons, LLC, 72 F. Supp. 3d 597, 608-09 (E.D. Pa. 2014)), aff'd sub nom. Leftwich v. Sec'y United States Dep't of the Treasury, 741 F. App'x 879 (3d Cir. 2018). A plaintiff "can support an inference of discrimination 'in a number of ways, including, but not limited to, comparator evidence, evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by her supervisors suggesting racial

10

animus.'" Id. (quoting Golod v. Bank of Amer. Corp., 403 F. App'x 699, 702 n.2 (3d Cir. 2010)).

Plaintiff argues that there is record evidence that supports an inference that he was terminated as a result of unlawful discrimination because he was replaced by Doug Detweiler, who is white. (Boston Decl. ¶ 23.) Discriminatory intent for purposes of the prima facie case can be inferred from the fact that the plaintiff's "replacement is of a different race than the plaintiff." Heard v. J & G Spas, LLC, Civ. A. No. 22-3212, 2024 WL 1511901, at *5 (E.D. Pa. Apr. 8, 2024) (citing McDonnell Douglas, 411 U.S. at 802; Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410-11 (3d Cir. 1999)). We conclude, accordingly, that Plaintiff has pointed to record evidence that could establish a prima facie case of discrimination with respect to his termination.

Plaintiff also argues that there is record evidence that supports an inference that he was given a two-day suspension as a result of unlawful discrimination because GPI treated other employees who parked in the handicapped parking spot more favorably. Plaintiff points to two videos showing cars parked in a handicapped spots with no visible handicapped placards or license plates. (See Pl. Ex. 4.) The videos indicates that they were filmed on March 24 and May 12, but Plaintiff has produced no evidence of the year in which the videos were made. (Id.) Plaintiff has also produced no evidence regarding who parked in the handicapped spot that day, whether that individual was an employee of GPI, or the race of any other GPI employees who improperly parked in handicapped parking spots without punishment. Moreover, Plaintiff has admitted that he was not suspended for merely parking in the handicapped parking spot, but also for failing to move his car into an authorized spot when he was asked to do so. (Boston Dep. Vol. 2 at 241.) We thus conclude that Plaintiff has not pointed to sufficient record evidence to

11

support an inference of discrimination with respect to his two-day suspension for parking in the handicapped parking space and then moving his car into another unauthorized space. Plaintiff has therefore failed to establish a prima facie case of disparate treatment with respect to his two-day suspension.

2. GPI's reason for terminating Plaintiff

As Plaintiff has pointed to sufficient record evidence to support a prima facie case of discrimination with respect to his termination, the burden shifts to GPI "to articulate a legitimate . . . nondiscriminatory reason" for the termination. Tourtellotte, 636 F. App'x at 842. GPI asserts that it terminated Plaintiff's employment because he had accumulated sufficient points under the attendance policy to warrant termination. As we discussed above, GPI's attendance policy provides that an employee will be terminated for accruing nine attendance points. (GPI Ex. C ¶ 3.5.1.) The evidence before us shows that Plaintiff had four attendance points on March 20, 2021. (GPI Ex. J at APPX 0320, 0326; GPI Ex. O at APPX 0490.) Plaintiff accrued an attendance point on April 17, 2021, bringing his total to five. (Id.) Plaintiff subsequently accrued another attendance point for a late call out on May 6, 2021 and an additional three points for absences on May 6, May 7 and May 17. (Id.) Thus, he had accrued a total of nine attendance points as of May 17, 2021. (Id.) Plaintiff was late to work on May 24, 2021 and he was absent on May 29, 2021, thus accumulating a total of 10.5 attendance points before he was retroactively terminated on June 3, 2021. (Id.) We conclude that GPI has met its burden of "articulat[ing] a legitimate . . . nondiscriminatory reason" for terminating Plaintiff. Tourtellotte, 636 F. App'x at 842.

12

3. Pretext

Since GPI has produced evidence that it had a legitimate, nondiscriminatory reason to terminate Plaintiff's employment, the burden shifts back to Plaintiff to point to evidence that GPI's reason for his termination "is merely a pretext" for discrimination. Id. (citations omitted). In order to show pretext and "defeat summary judgment at the third McDonnell Douglas step," Plaintiff is obligated to "'point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" Canada v. Samuel Grossi & Sons, Inc., 49 F.4th 340, 347 (3d Cir. 2022) (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)). "An employee may meet [his] burden by 'painting the [employer's articulated reasons] as weak, implausible, contradictory, or incoherent.'" Id. (second alteration in original) (quoting Fuentes, 32 F.3d at 765). The employee may also meet this burden "'by showing that the employer in the past had subjected [the employee] to unlawful discriminatory treatment, [or] that the employer treated other, similarly situated persons not of his protected class more favorably.'" Id. (alterations in original) (quoting Fuentes, 32 F.3d at 765). "If the plaintiff makes this showing, summary judgment is improper because the plaintiff has raised 'a factual issue regarding the employer's true motivation for discharge.'" Id. (quoting Jalil v. Avdel Corp., 873 F.2d 701, 707 (3d Cir. 1989)). "We look at the totality of the circumstances to determine whether an employer's proffered nondiscriminatory reason is pretext for a discriminatory motive." Id.

a. statistical evidence

Plaintiff relies on three different types of evidence in attempting to show that GPI's reason for terminating his employment is pretextual. He first relies on what he calls "statistical

13

evidence." Plaintiff argues that a reasonable fact finder could find that GPI's reason for terminating him is pretext because GPI employed a diverse workforce including racial minorities, yet has failed to promote any racial minorities to managerial positions. In support of this argument, Plaintiff points to the deposition testimony of Kevin Morrison, who stated that the workforce at the Valley Forge GPI location was very diverse, but there were no African American department managers or supervisors. (Morrison Dep. at 35, 37-38.)

"'Statistical evidence of an employer's pattern and practice with respect to minority employment may be relevant to a showing of pretext.'" Boykins v. SEPTA, 722 F. App'x 148, 155 (3d Cir. 2018) (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 542 (3d Cir. 1992)). "But first, a plaintiff must demonstrate the statistical significance of the data." Id. (citing Keller v. Orix Credit All., Inc., 130 F.3d 1101, 1112 n.4 (3d Cir. 1997); Berger v. Iron Workers Reinforced Rodmen, 843 F.2d 1395, 1420 (D.C. Cir. 1988)). Where the court must engage in speculation regarding the relevance of proffered statistical evidence, it may find that evidence to be insufficient. See Flax v. Dep't of Gen. Servs., Civ. A. No. 20-2211, 2024 WL 3717058, at *9 (M.D. Pa. Apr. 1, 2024) ("Statistical evidence is unconvincing if it requires the court to speculate about its relevance." (citing Newark Branch, N.A.A.C.P. v. City of Bayonne, N.J., 134 F.3d 113, 121 (3d Cir. 1998))), report and recommendation adopted, 2024 WL 3717275 (M.D. Pa. July 9, 2024).[2]

---

[2] In Flax, the court found that the statistics upon which the plaintiff relied required such significant speculation that they did not support the plaintiff's prima facie case:

> Here, the statistics cited by Flax require significant speculation. The evidence presented by Flax only shows that between 2016 and 2023, none of the 11 African American employees in the Capitol Police were promoted and 14 of the 163 white employees were promoted. It does not show how many African American officers applied for promotions between 2016 and 2023. Without that information, no reasonable juror could infer that the Capitol Police disproportionately promoted white officers over African American officers. Accordingly, in our

14

We conclude that Plaintiff's "statistical evidence" that none of GPI's Valley Forge managers are racial minorities fails to support a finding of pretext because Plaintiff has presented no evidence that would allow a factfinder to draw a reasonable inference that simply because no managers are racial minorities, GPI had a pattern of denying minority applicants managerial positions. Indeed, Plaintiff has not pointed to any evidence of GPI employees who applied for managerial positions and were denied such positions, much less evidence that any denied applicant was a racial minority. Under these circumstances, Plaintiff's "statistical evidence," such as it is, requires pure speculation as to the cause of the racial make-up of GPI's managerial ranks.[3] We thus conclude that this evidence does not provide support for a reasonable inference that GPI's reason for terminating Plaintiff was not credible or "that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [GPI's] action." Canada, 49 F.4th at 347 (quotation omitted).

### b.    the culture of discrimination

Plaintiff also relies on evidence of what he considers to be a culture of discrimination at GPI's Valley Forge location to support his contention that a reasonable fact finder could disbelieve GPI's reason for his termination or believe that GPI was actually motivated by invidious racial discrimination. See Canada, 49 F.4th at 347 (quotation omitted). "[E]vidence of an employer's 'culture' may constitute circumstantial evidence of discrimination." Johnson v.

---

view, Flax has not established a prima facie disparate treatment claim based on the defendants' failure to promote him.

Id. (citing Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 299-300 (3d Cir. 2014)) (record citations omitted).

[3] Indeed, it does not appear that Plaintiff's "statistical evidence" involves statistics. While all statistics use numbers, not all numbers, such as zero, are statistics.

<u>Federal Express Corp.</u>, Civ. A. No. 12-444, 2014 WL 805995, at *8 (M.D. Pa. Feb. 28, 2014), (citing <u>Brewer v. Quaker State Oil Ref. Corp.</u>, 72 F.3d 326, 333 (3d Cir. 1995)).

To support his argument that GPI had a culture of discrimination, Plaintiff relies on evidence that a profanity and a swastika had been scratched on a bathroom wall at the Valley Forge GPI location.  When Mr. Morrison was asked at his deposition if he recalled any GPI employee complaining about this image, he said that he did not.  (Morrison Dep. at 47-48.) Plaintiff contends that the fact that no one complained to HR is evidence that "no employee felt comfortable coming forward to human resources to let human resources know about this gross depiction."  (Pl. Resp. at 6 (citation omitted).)  However, Plaintiff does not support this contention with employee testimony or any other evidence about what may have dissuaded employees from lodging a complaint.  Rather, his contention is based entirely on supposition. Mr. Morrison was also asked at his deposition if he considered this image to be a racially charged image and he replied:  "I would consider it an image with racial implications on it.  I don't -- I can't say I would know what it was intended to speak to outside of the symbols that were on the picture.  I would have to fully investigate before assuming it was racially charged." (Morrison Dep. at 48.)  In Plaintiff's view, Mr. Morrison's failure to immediately denounce this image is evidence of a culture of racism at GPI.  Plaintiff also asserts that Mr. Morrison's response to this question is evidence that he and other GPI employees believed that GPI's management and HR "participated in the discrimination and/or did nothing to stop it."  (Pl. Reply at 6.)  These assertions are, again, based entirely on supposition.  We cannot find that Plaintiff's suppositions and a picture of a profanity and swastika scratched on a bathroom wall would support a finding that "an invidious discriminatory reason was more likely than not a

16

motivating or determinative cause of [GPI's] action." Canada, 49 F.4th at 347 (quotation omitted).

c.     comparator evidence

Plaintiff argues that evidence showing that he was treated differently than similarly situated individuals outside of his protected class with regard to attendance points shows that GPI's reason for his termination was pretext. An employee can establish pretext "by demonstrating, among other things, that the employer treated other, similarly situated persons not of his protected class more favorably." Qin, 100 F.4th at 475 (quotation omitted). The record contains evidence that GPI worked with seven employees to reduce their attendance points so that they could avoid discipline:

1. **Michael Antenucci**: Mr. Antenucci is a Caucasian man who was formerly employed by GPI. (Joint Concise Statement of Material Facts ¶ 57.) The evidence shows that he reached nine attendance points on June 28, 2019, which warrants termination under GPI's attendance policy. (See Pl. Ex. 8 at Supp_GPI_Boston 0000105; GPI Ex. C ¶ 3.5.1.) When GPI "review[ed] the attendance points with Mr. Antenucci, it was reiterated that his failure to submit a doctor's note in early February for this three-day illness, resulted in escalated point accumulation." (Pl.'s Ex. 8 at Supp_GPI_Boston 0000105.) In "a one-time non-precedent binding decision," GPI agreed with the union to consider Mr. Antenucci's medical absences as if he had submitted a doctor's note and to allow Mr. Antenucci to continue to work with his nine-point balance. (Id.) The agreement "require[d] Mr. Antenucci to successfully complete a sixty (60) calendar day exception period with no attendance infractions." (Id.) If Mr. Antenucci was successful, he would earn a credit point that would reduce his total attendance points, but, if he failed to "gain the credit point during the exception period" he would be immediately terminated.

17

(Id.)  After GPI reached that agreement with Mr. Antenucci and the union, GPI discovered that Mr. Antenucci had also been absent on July 8, 2019, meaning that he had ten attendance points rather than nine.  (Id. at Supp_GPI_Boston 0000106.)  Rather than terminate Mr. Antenucci, GPI extended his exception period to 120 days, allowing him avoid termination by gaining two credit points.  (Id.)

2.  **Tiffany Reilly**:  GPI removed a late point issued to Ms. Reilly on July 22, 2021 because her supervisor had approved a schedule change and failed to update the attendance system.  (Pl. Supp. Resp. Ex. 1 at Supp_GPI_Boston 0000216.)  Plaintiff states that Ms. Reilly is a Pacific Islander.  (Pl. Supp. Resp. at 10.)

3.  **Omar Patino**:  On August 5, 2021, GPI excused 2.5 attendance points that had been assigned to Mr. Patino due to clocking issues.  (Id. Ex. 1 at Supp_GPI_Boston 0000217.)  GPI considered giving Mr. Patino an additional attendance point for missing work on January 9, 2022, which would have resulted in his accruing 9.5 points and being terminated, but he was not given that attendance point because he had called out that day.  (Id. Ex. 1 at Supp_GPI_Boston 0000228-29.)  Plaintiff states that Omar Patino is Hispanic.  (Pl. Supp. Resp. at 10.)

4.  **Jon Hahn**:  GPI excused an absence for Mr. Hahn on September 7, 2021.  (Id. Ex. 1 at Supp_GPI_Boston 0000218.)  He had been stuck on back roads and was unable to get to work.  (Id.)  He had submitted a police report to support his absence.  (Id.)  Plaintiff states that Jon Hahn is Caucasian.  (Pl. Supp. Resp. at 10.)

5.  **Roman Ramos**:  Mr. Ramos had accumulated nine attendance points as of October 25, 2021.  (Id. Ex. 1 at Supp_GPI_Boston 0000226.)  GPI reduced Mr. Ramos's attendance points to six (written warning) on November 11, 2021 as follows:  GPI reduced Mr. Ramos's total by one and one-half points as of June 11, 2021 because it had been 60 days since

18

A021

he last accrued any attendance points and removed one and one-half points that he had been assigned for an absence on June 15, 2021, because his absence that day had been scheduled. (Id.) Plaintiff states that Mr. Ramos is African American. (Pl. Supp. Resp. at 10.)

6.     **Andy Webb**:  Mr. Webb was given four points for being AWOL on September 26, 2021.  (Id. at Ex. 1 at Supp_GPI_Boston 0000225.)  He had not clocked in that day and arrived late at his worksite. (Id. Ex. 1 at Supp_GPI_Boston 0000220.)  He also left early without permission.  (Id. Ex. 1 at Supp_GPI_Boston 0000220-22.) That resulted in a total of nine and one-half points, which should have resulted in termination under GPI's attendance policy.  (Id. Ex. 1 at Supp_GPI_Boston 0000224-25.)  However, those four points were removed because GPI was working on corrective action.  (Id. Ex. 1 at Supp_GPI_Boston 0000224.)  Plaintiff states that Andy Webb is African American.  (Pl. Supp. Resp. at 10.)

7.     **Derrick Hamilton**:  Mr. Hamilton had a total of nine and one-half attendance points on July 14, 2020.  (Id. Ex. 1 at Supp_GPI_Boston 0000237.)  Rather than terminate Mr. Hamilton, GPI agreed with the union to give Mr. Hamilton a last chance agreement on August 7, 2020. (Id. Ex. 1 at Supp_GPI_Boston 0000245.)  Pursuant to this agreement, Mr. Hamilton was reinstated and his prior time off was considered to be a disciplinary suspension. (Id. ¶ 1.)  The agreement also provided that any additional absenteeism on the part of Mr. Hamilton over the following six months would result in his immediate discharge.  (Id. ¶ 2.)  GPI asserts that Hamilton is African American. (GPI Supp. Reply at 2.)

In addition to the individuals listed above, with whom GPI worked to reduce their attendance points, the record also contains evidence that GPI terminated Josh Berry, a Caucasian male, for having 14 attendance points on November 3, 2021.  (Pl. Supp. Resp. Ex. 1 at Supp_GPI_Boston 0000230-32.)

19

A022

Plaintiff argues that this evidence shows that "GPI frequently exercised discretion to reduce or overlook attendance points for favored employees . . . while applying a stricter standard to [him]." (Pl. Supp. Resp. at 1.) He also contends that this evidence "exposes a pattern of inconsistent application of the company's attendance policy," showing that GPI "frequently worked with select employees to reduce their attendance points, even after accumulating enough for termination." (Id. at 2.) However, even accepting that the attendance policy was not consistently applied, the evidence of record does not show that those employees receiving more favorable treatment were outside of Plaintiff's protected class. Rather, of the seven identified individuals with whom GPI worked to reduce their attendance points, three (Mr. Hamilton, Mr. Webb, and Mr. Ramos) are African American; one (Mr. Patino), is Hispanic; one (Ms. Reilly) is a Pacific Islander; and two (Mr. Hahn and Mr. Antenucci) are Caucasian. Indeed, of the four employees with whom GPI worked to reduce their attendance points after they had accrued sufficient attendance points to warrant termination, one is Caucasian and the other three are African American. Evidence of "comparator employees . . . of multiple races . . . does not support a claim that race [was a] motivating or determinative factor[] in the adverse employment action[]." Wilcher v. Postmaster Gen., 441 F. App'x 879, 882 (3d Cir. 2011). Thus, the evidence regarding GPI's treatment of individuals who were similarly situated to Plaintiff because they, too, had accrued nine or more attendance points does not support a reasonable inference that race was a motivating factor for Plaintiff's termination.

Having found that Plaintiff has not pointed to any evidence that could support a finding that GPI's stated reason for terminating his employment was actually pretext for race discrimination, we conclude that he has failed to meet his summary judgment burden of pointing to evidence "sufficient to establish the existence of an element essential to [his case]." Celotex,

477 U.S. at 322. Consequently, we grant GPI's Motion for Summary Judgment with respect to Plaintiff's disparate treatment claim under § 1981 and Title VII.

B.        Hostile Work Environment

GPI argues that it is entitled to summary judgment as to Plaintiff's hostile work environment claims on the grounds that Plaintiff cannot establish that he was subjected to a hostile work environment based on his race. To establish a prima facie case of employment discrimination due to a hostile work environment, a plaintiff must demonstrate the following five elements:   "(1) [h]e suffered intentional discrimination because of [his] race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected [him]; (4) the discrimination would have detrimentally affected a reasonable person of the same race in [his] position; and (5) there is a basis for employer liability." Leftwich, 741 F. App'x at 882 (citing Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996)). Discrimination is severe or pervasive if it "'alter[s] the conditions of [the victim's] employment and create[s] an abusive working environment.'" Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998) (second alteration in original) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)). "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" Id. at 788 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)). "The hostility of a work environment must be determined by the totality of the circumstances." Fichter v. AMG Res. Corp., 528 F. App'x 225, 230 (3d Cir. 2013) (citing Harris v. Forklift Sys., 510 U.S. 17, 23 (1993)). "Such circumstances may include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. (quoting Harris, 510 U.S. at 23).

21

A024

1.      Existence of a hostile work environment

Plaintiff argues that Mr. Dennis's use of the "N-word" to describe him is sufficient to establish a hostile work environment.  The Third Circuit has examined whether, "[u]nder the correct 'severe or pervasive' standard, . . . [a] supervisor's single use of the 'n-word' is adequately 'severe' and if one isolated incident is sufficient to state a claim under that standard." Castleberry v. STI Grp., 863 F.3d 259, 264 (3d Cir. 2017).  The Third Circuit determined that, while "the resolution of that question is context-specific, it is clear that one such instance can suffice to state a claim."  Id. (citing Faragher, 524 U.S. at 788; Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001) (per curiam)) (add'l citation omitted).  "However, a plaintiff must plead the incident to 'be [sufficiently] extreme to amount to a change in the terms and conditions of employment' for it to serve as the basis of a harassment claim."  Id. (quoting Faragher, 524 U.S. at 788).

In this case, the employee who used the "N-word" to describe Plaintiff was Plaintiff's coworker, not a supervisor.[4]  The Third Circuit has determined that a single use of the "N word" by a co-worker, rather than a supervisor, is not sufficient to establish a hostile work environment if there is "no other evidence suggesting some racial animus in the workplace" and the comment "did not unreasonably interfere[] with [the plaintiff's] work performance, discourage[] him from remaining on the job, or interfere[] with advancement."  Gladden v. Ambler Healthcare Grp., LLC, No. 22-3432, 2024 WL 260960, at *2 (3d Cir. Jan. 24, 2024) (quotations omitted). Moreover, if the employer intervenes in a way that prevents repetition of the slur, the employer cannot be liable.  Id. (citing Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 110

---

[4] As we discussed supra, Mr. Dennis and Plaintiff were both GPI employees at the same level.  (Boston Dep. Vol. 2 at 224.)  Both men worked on the same machine; Mr. Dennis operated the machine during the day shift, while Plaintiff operated the machine during the night shift.  (See Boston Dep. Vol. 1 at 73-74.)

22

(3d Cir. 2009)).  See also Huston, 568 F.3d at 110 ("[T]he employer cannot be liable under Title VII if its remedial action stopped the harassment." (citation omitted)).

The record contains some evidence beyond Mr. Dennis's remark upon which a jury could find that there is some racial animus at GPI's Valley Forge facility, namely the swastika and profanity scratched into the metal wall of the men's bathroom.  (See Pl. Resp. at 1.)  However, Plaintiff has pointed to no evidence that Mr. Dennis's use of the "N-word" discouraged him from staying at GPI or interfered with his advancement.  The evidence also shows that GPI intervened in a way that prevented Mr. Dennis from repeating the slur.  Specifically, Mr. Morrison immediately investigated the incident and placed Mr. Dennis on suspension the next day.  (GPI Ex. J at APPX 0403.)  GPI's Director of Human Resources reviewed the investigation and, on May 4, 2020, instructed Mr. Morrison to convert Mr. Dennis's suspension to termination as of May 5, 2020.  (GPI Ex. M at APPX 0480.)  We conclude, based on the evidence of record, that GPI cannot be found liable for Mr. Dennis's remark because the evidence shows that GPI prevented Mr. Dennis from repeating his conduct by immediately suspending and then firing him.  See Gladden, 2024 WL 260960, at *2 (citing Huston, 568 F.3d at 110).  We further conclude, accordingly, that Plaintiff has failed to point to evidence that establishes a genuine issue of material fact regarding whether he has demonstrated a prima facie case that he was subjected to a racially hostile work environment at GPI and we grant the instant Motion with respect to Plaintiff's hostile work environment claims under § 1981 and Title VII.

C.     Retaliation

GPI argues that it is entitled to summary judgment with respect to Plaintiff's retaliation claim because Plaintiff cannot establish a prima facie case of retaliation under § 1981 and Title VII.  Under the McDonnell Douglas framework, a plaintiff asserting a retaliation claim first must

23

establish a prima facie case by showing "(1) [that she engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." Daniels, 776 F.3d at 193 (alteration in original) (quoting Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007)). "If the plaintiff makes these showings, the burden of production of evidence shifts to the employer to present a legitimate, non-retaliatory reason for having taken the adverse action." Id. (citing Marra, 497 F.3d at 300). "If the employer advances such a reason, the burden shifts back to the plaintiff to demonstrate that 'the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" Id. (quoting Marra, 497 F.3d at 300).

> 1.   Protected Activity

"For purposes of the first prong of a prima facie case of retaliation, protected 'opposition' activity includes not only an employee's filing of formal charges of discrimination against an employer but also 'informal protests of discriminatory employment practices, including making complaints to management.'" Id. (quoting Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006)) (add'l citation omitted). "Furthermore, although a plaintiff in a retaliation case 'need not prove the merits of the underlying discrimination complaint,' she must have 'act[ed] under a good faith, reasonable belief that a violation existed.'" Id. (alteration in original) (quoting Moore v. City of Philadelphia, 461 F.3d 331, 344 (3d Cir. 2006)). "This standard requires an 'objectively reasonable belief' that the activity the plaintiff opposed constituted unlawful discrimination under the relevant statute." Id. at 193-94 (quoting Wilkerson v. New Media Tech. Charter Sch. Inc., 522 F.3d 315, 322 (3d Cir. 2008)).

24

GPI acknowledges, for purposes of this Motion, that Plaintiff engaged in protected activity when he complained about Mr. Dennis referring to him using the "N-word" and that he experienced an adverse employment action when he was terminated.  (GPI Br. at 21.)  Plaintiff points to evidence that he engaged in additional protected activity when, at least one year before he complained about Mr. Dennis, he complained to Mr. Morrison that he "was being harassed by coworkers and management, Mr. Nonamaker, Mr. Moore, and Mr. Dennis because [he is] Black. (Boston Decl. ¶ 4.)  Plaintiff also "complained to [his] international union representative, John Ashe. [He] told him that [he] was being profiled by Gary Moore, William Dennis, and another manager." (Id. ¶ 6.)  However, Plaintiff does not state when he made this complaint.  Based on GPI's concession and the record evidence, we conclude that Plaintiff has adequately established that he engaged in protected activity.  Moreover, there is no dispute that Plaintiff was subjected to an adverse employment action when he was terminated on June 3, 2021.

GPI nevertheless argues that it is entitled to summary judgment in its favor with respect to Plaintiff's retaliation claims because Plaintiff cannot point to evidence of a causal connection between his protected activity and his termination.  Causation can be shown "by proffering evidence of an employer's inconsistent explanation for taking an adverse employment action, a pattern of antagonism, or temporal proximity 'unusually suggestive of retaliatory motive.'" Carvalho-Grevious, 851 F.3d at 260 (quoting Shaner v. Synthes, 204 F.3d 494, 505 (3d Cir. 2000) (citations omitted).  "'[T]he proffered evidence, looked at as a whole, may [also] suffice to raise the inference.'"  Id. (quoting Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997)).  The Third Circuit has held that "on its own, an intervening temporal period of two days may raise the inference of causation but that a period of two months cannot."  Id. at 261 n.8

(citing Jalil, 873 F.2d at 708; Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 759-60 (3d Cir. 2004)).

Plaintiff has pointed to no evidence that GPI gave inconsistent explanations for his termination.  There is also insufficient temporal proximity to suggest a retaliatory motive in this case.  Plaintiff complained to Mr. Morrison about Mr. Dennis referring to him as an "N-word" on April 29, 2020.  (See Boston Dep. Vol. 2 at APPX 0087.)  By Plaintiff's own account, his other complaints to GPI's management about racial harassment took place at least a year before his complaint about Mr. Dennis and there is no evidence regarding when he complained to his union representative.  (See Boston Decl. ¶¶ 4, 6.)  GPI terminated Plaintiff's employment by letter dated June 3, 2021.  (Boston Dep. Vol. 1 at APPX 0307.)  Plaintiff was thus terminated by GPI more than one year after he engaged in protected activity by complaining to Mr. Morrison about Mr. Dennis and more than two years after his complaints about racial harassment to GPI management.  Under these circumstances, Plaintiff's protected activity and his termination are not close enough in time to raise a reasonable inference of causation.[5]  Carvalho-Grevious, 851 F.3d at 261 n.8 (citations omitted); see also LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." (citations omitted)); Gethers v. PNC Bank, 813 F. App'x 746, 750 (3d Cir. 2020) (determining that termination approximately one year after the plaintiff's protected activity did

---

[5] Since we have no evidence regarding the timing of Plaintiff's complaint to his union representative, we cannot find that the evidence regarding this protected activity could raise a reasonable inference of causation.

26

"not raise an inference of a connection between [the plaintiff's] complaint and the termination" (citing LeBoon, 503 F.3d at 233)).

The Third Circuit has instructed that "where there is a lack of temporal proximity, circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference" that there is a causal link between the protected activity and the adverse employment action. Kachmar, 109 F.3d at 177 (quoting Robinson v. Southeastern Pa. Transp. Auth., 982 F.2d 892, 895 (3d Cir. 1993)). Plaintiff argues that there is evidence in the record that would establish a pattern of antagonism following his protected conduct, and specifically points to evidence of three instances of alleged antagonism that followed his protected activity. In the first, which Plaintiff recounted in his deposition, Mr. Moore told other managers to write him up over small matters, although Plaintiff has presented no evidence as to how many times such write ups occurred, if at all. (Boston Dep. Vol. 1 at 90-92.) In the second, also recounted in Plaintiff's deposition, Mr. Moore cursed at him for running his machine too slowly and looking at his phone, conduct for which Plaintiff was disciplined. (Id. at 40-43; Boston Dep. Vol. 2 Ex. 4 at APPX 0189.) Notably, Plaintiff filed a grievance regarding this incident and, as a result, on November 21, 2019, Plaintiff's discipline was reduced to a written warning for using his phone. (Boston Dep. Vol. 2, Ex. 4 at APPX 0189.) The third incident of alleged antagonism is Plaintiff's May 11, 2021 suspension for parking in a handicapped parking place and then moving his car into another unauthorized parking space. (See Boston Decl. ¶¶ 20-22; Boston Dep. Vol. 2 at 240-41.)

While Plaintiff argues that there were additional instances of antagonism or discipline, he has presented no evidence that these instances occurred after his protected activity. For instance, he testified at his deposition that Mr. Moore would not allow him to drive a forklift even though

27

he had obtained a forklift certification at GPI's direction. (See Boston Dep. Vol. 2 at 192-94.) However, instead of placing Mr. Moore's conduct within a specific time frame, he merely testified that Moore "had a problem with it at some point." (Id. at 193.) Similarly, Plaintiff states in his Declaration that he won a grievance against Mr. Moore for unfairly writing him up over not signing paperwork, but he introduces no evidence that this occurred after he engaged in protected activity. (Boston Decl. ¶ 10.) And finally, Plaintiff attests in his Declaration or testified at his deposition about three other incidents of antagonism, but there is no evidence in the record as to when any of these incidents occurred, much less that they occurred after Plaintiff's protected activity. These three incidents are: (1) three different managers, including Mr. Moore, transferred him to slow his production numbers and Plaintiff successfully grieved one of those transfers that had resulted in a write-up (id. ¶¶ 11-13); (2) Mr. Moore wrote up Plaintiff for using the wrong materials on a job and, after Plaintiff complained to Mr. Moore's boss, the write-up was dismissed (Boston Dep. Vol. 1 at 37-39); (3) a different manager, Matt McMenamin, yelled at Plaintiff for using the bathroom at the end of his shift (id. at 44-46).

"A 'pattern of antagonism' is a consistent and continuous pattern of conduct, which can include a 'constant barrage of written and verbal warnings,' as well as disciplinary action." Stinson v. Triple Canopy, Inc., Civ. A. No. 21-4557, 2023 WL 4763993, at *6 (E.D. Pa. July 26, 2023) (quoting Bartos v. MHM Corr. Servs., Inc., 454 F. App'x 74, 79 (3d Cir. 2011)). Where, as here, Plaintiff has pointed to evidence of only three instances in which he was disciplined or harassed by GPI management after he engaged in protected conduct, and these incidents occurred over a period of approximately two years, no reasonable factfinder could find that there was "a consistent and continuous pattern of conduct" or that the incidents comprised a "constant barrage of written and verbal warnings." Id. (quotation omitted). Accordingly, we conclude that

28

A031

Plaintiff has not satisfied his burden of pointing to evidence of a pattern of antagonism that would demonstrate a casual link between his protected activity and his termination. <u>See</u> <u>Kachmar</u>, 109 F.3d at 177 (quotation omitted). We conclude, accordingly, that Plaintiff has not established a prima facie case of retaliation in violation of Title VII and § 1981.

**IV.** **CONCLUSION**

For the foregoing reasons, we grant GPI's Motion for Summary Judgment and enter judgment in favor of GPI with respect to both of Plaintiff's claims for relief. An Order follows.

BY THE COURT:

/s/ John R. Padova

_____

John R. Padova, J.

29

A032