**UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

**Case No. 25-1698**

**MAURICE BOSTON**

**Appellant,**

**v.**

**GRAPHIC PACKAGING INTERNATIONAL, LLC**

**Appellee.**

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA IN CASE NO. 2:22-CV-03473, HON. JOHN R. PADOVA

**BRIEF FOR APPELLEE**

**LITTLER MENDELSON, P.C.**
Barbara Rittinger Rigo (PA 76630)
Kevin B. Frankel (PA 327459)
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA  19102.1321
267.402.3016 (t)
brigo@littler.com
kfrankel@littler.com

Attorneys for Appellee

**TABLE OF CONTENTS**

I.     JURISDICTIONAL STATEMENT .................................................................... 1

II.    STATEMENT OF RELATED CASES ............................................................ 1

III.   COUNTERSTATEMENT OF THE ISSUES PRESENTED FOR REVIEW.................... 1

IV.   CONCISE COUNTERSTATEMENT OF THE CASE........................................ 3

      A.     Relevant Facts ................................................................................ 3

           1.     In 2016, Boston Begins Work At GPI's Vally Forge Facility, Where Employees Who Accumulate Nine Points Under The Progressive-Discipline Policy Were Typically Discharged ....................... 3

           2.     In 2019 and 2020, Boston Complains Of Race Discrimination, Including One Complaint Leading GPI To Discharge Boston's Co-Worker ................................................................................ 5

           3.     In 2021, Boston Is One Of 14 People GPI Discharges For Accumulating Over Nine Attendance Points ............................................. 7

      B.     Procedural History ...................................................................... 10

V.    SUMMARY OF THE ARGUMENT ............................................................ 11

VI.   ARGUMENT ............................................................................................ 13

      A.     Standard of Review...................................................................... 13

      B.     The *Muldrow* Decision ................................................................ 14

           1.     Discrimination........................................................................ 15

           2.     Hostile Work Environment ..................................................... 17

      C.     The District Court Properly Dismissed Appellant's Discrimination Claims Under Title VII and Section 1981........................................................ 18

           1.     Appellant's Transfer Does Not Constitute Prima Facie Discrimination........................................................................ 20

           2.     The "Fabricated Write Ups" Do Not Constitute "Harm," Regardless of *Muldrow*'s Lesser Standard ............................................. 22

3.      The District Court Correctly Found That GPI's Enforcement of its Parking Policy Did Not Carry an Inference of Discrimination with Respect to Boston ........................................................... 24

4.      The District Court Correctly Held That Boston's Termination Was Not Discriminatory ........................................................... 28

5.      Boston Cannot Save His Discrimination Claims by Arguing Mixed Motive ........................................................... 34

D.    The District Court Properly Dismissed Appellant's Hostile Work Environment Claim ........................................................... 35

1.      Boston Cannot State a Prima Facie Case Because GPI Took Immediate, Effective Remedial Action After Boston's Coworker Called Him the N-Word ........................................................... 35

2.      *Muldrow* Did Not Establish a Lesser Standard for Hostile Work Environment Claims ........................................................... 38

E.    The District Court Properly Dismissed Appellant's Retaliation Claim ............... 39

1.      There is No Temporal Proximity Between Boston's Protected Activity and GPI's Discharge of Boston ................................................. 40

2.      There is Neither Direct Evidence of GPI Having a Retaliatory Motive Nor a Pattern of Antagonism With Respect to Boston ................ 41

VII.    CONCLUSION ........................................................... 45

CERTIFICATE OF BAR MEMBERSHIP, COMPLIANCE WITH TYPE-VOLUME LIMITATION AND TYPEFACE REQUIREMENTS AND VIRUS CHECK ............. 47

CERTIFICATE OF SERVICE ........................................................... 48

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alinoski v. Musculoskeletal Transplant Found. Inc.*,
No. 15-cv-0640, 2016 WL 3165622 (M.D. Pa. June 7, 2016), aff'd 679 Fed.
App'x 224 (3d Cir. 2017).................................................................................................29

*Ames v. Ohio Dept. of Youth Services*,
145 S. Ct. 1540 (U.S. 2025)..........................................................................................35

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 254 (1986)...............................................................................................14

*Andrews v. City of Phila.*,
895 F.2d 1469 (3d Cir. 1990).........................................................................................36

*Aubrecht v. Pa. State Police*,
389 F. App'x 189 (3d Cir. 2010) ....................................................................................13

*Barness v. Nationwide Mut. Ins. Co.*,
598 F. App'x 86 (3d Cir. 2015) ................................................................................23, 24

*Bennett v. SEPTA*,
No. 24-1376, 2025 WL 1248815 (3d Cir. April 30, 2025)..............................................18

*Brewer v. Quaker State Oil Ref. Corp.*,
72 F.3d 326 (3d Cir. 1995)........................................................................................30, 34

*Canada v. Samuel Grossi & Sons, Inc.*,
49 F.4th 340 (3d Cir. 2022) ...........................................................................................31

*Carvalho-Grevious v. Del. State Univ.*,
851 F.3d 249 (3d Cir. 2017)......................................................................................43, 44

*Castleberry v. STI Group*,
863 F.3d 259 (3d Cir. 2017)............................................................................................37

*Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*,
140 S. Ct. 1009 (2020)..............................................................................................14, 15

*Culler v. Shineski*,
840 F. Supp. 2d 838 (M.D. Pa. 2011).............................................................................43

*Daniels v. Sch. Dist. Of Phila.*,
776 F.3d 181 (3d Cir. 2015)............................................................................................41

*Deans v. Kennedy House Inc.*,
    998 F. Supp. 2d 393 (E.D. Pa. 2014) ....................................................................23

*Ezold v. Wolf, Block, Schorr & Solis-Cohen*,
    983 F (3d Cir. 1992) ............................................................................................30

*Fuentes v. Perskie*,
    32 F.3d 759 (3d Cir. 1994) ..................................................................................31

*Gethers v. PNC Bank*,
    813 F. App'x 746 (3d Cir. 2020) ..........................................................................42

*Gladden v. Ambler Healthcare Group, LLC*,
    No. 22-3432, 2024 WL 260960 (3d Cir. January 24, 2024) ..................................38

*Hankins v. Temple University (Health Sciences Center)*,
    829 F.2d 437 (3rd Cir. 1987) ...............................................................................13

*Huston v. Procter & Gamble Paper Prods. Corp.*,
    568 F.3d 100 (3d Cir. 2000) ...................................................................36, 37, 38

*Kachmar v. SunGuard Data Sys., Inc.*,
    109 F.3d 173 (3d Cir. 1997) .................................................................................44

*Kier v. F. Lackland & Sons, LLC*,
    72 F. Supp. 3d 597 (E.D. Pa. 2014) .....................................................................43

*Larochelle v. Wilmac Corp.*,
    210 F. Supp. 3d 658 (E.D. Pa. 2016) ...................................................................29

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n.*,
    503 F.3d 217 (3d Cir. 2007) ...........................................................................42, 43

*Leftwich v. Sec. United States Dept. of Treasury*,
    741 F. Appx. 879 (3rd Cir. 2018) .....................................................................17, 28

*Leite v. School District of Philadelphia*,
    No. 24-2607, 2025 WL 1564796 (3d Cir. June 3, 2025) ...................................21, 23

*MacDougall v. Rhuling*, Case No. 24-cv-0989, 2024 WL 3993213 (E.D. Pa. Aug.
    28, 2024) ..........................................................................................................17, 21

*Makky v. Chertoff*,
    541 F.3d 205 (3d Cir. 2008) .................................................................................35

*McCrorey v. City of Philadelphia*,
    No. 23-2539, 2025 WL 1392164 (3d Cir. May 14, 2025) ......................................16

iv

*Mickens-Thomas v. Vaughn,*
  407 F. App'x 597 (3d Cir. 2011) ...................................................................13, 27, 47

*Mojica v. Advance Auto Parts, Inc.,*
  No. 15-cv-1418, 2016 WL 107844 (E.D. Pa. Jan. 11, 2016).....................................28

*Moore v. City of Phila.,*
  461 F.3d 331 (3d Cir. 2006)......................................................................................41

*Muldrow v. City of St. Louis*, 601 U.S. 346 (2024)....................................... *passim*

*Qin v. Vertext, Inc.,*
  100 F. 4th 458 (3d Cir. 2024) ...................................................................................19

*Raffaele v. Potter,*
  No. 09-3622, 2012 WL 33035 (E.D. Pa. January 6, 2012).......................................23

*Robinson v. SEPTA,*
  982 F.2d 892 (3d Cir. 1993)......................................................................................44

*Rodgers v. Western-Southern Life Ins. Co.,*
  12 F.3d 668 (7th Cir. 1993) ......................................................................................37

*Russo v. Bryn Mawr Trust Co.,*
  No. 22-3235, 2024 WL 3738643 (3d Cir. August 9, 2024).......................................18

*Tomasso v. Boeing Co.,*
  445 F.3d 702 (3d Cir. 2006)......................................................................................31

*Wilcher v. Postmaster Gen.,*
  441 F. App'x 879 (3d Cir. 2011) ..............................................................................33

*Williams v. Phila. Hous. Auth. Police Dept.,*
  380 F.3d 751 (3d Cir. 2004)......................................................................................42

*Woodson v. Scott Paper Co.,*
  109 F.3d 913 (3d Cir. 1997).....................................................................................44

**Statutes**

28 U.S.C. § 1291......................................................................................................1

28 U.S.C. § 1331......................................................................................................1

42 U.S.C. § 1981............................................................................................ *passim*

42 U.S.C. § 2000e.................................................................................................1, 11

**Other Authorities**

Fed. R. Civ. P. 56(a) ................................................................................................13

## I.   JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this matter under 28 U.S.C. § 1331 because this action arose under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.  This Court has appellate jurisdiction under 28 U.S.C. § 1291 because Appellant Maurice Boston ("Boston") is appealing a final order of the United States District Court for the Eastern District of Pennsylvania.

## II.   STATEMENT OF RELATED CASES

There are no cases or proceedings related to this appeal pending before this Court or any other court or administrative agency.

## III.   COUNTERSTATEMENT OF THE ISSUES PRESENTED FOR REVIEW

In this action under 42 U.S.C. § 1981 and 42 U.S.C. § 2000e *et seq.*, Boston claimed his former employer, Graphic Packaging International, LLC ("GPI") subjected him to a hostile environment, and then fired him, because he is African-American.  He also claimed GPI discharged him because he protested race discrimination.  The District Court granted summary judgment to GPI.  This appeal presents four issues:

> 1.   The District Court correctly entered summary judgment as to Boston's disparate-treatment theory based on his discharge, because he lacked comparator evidence, direct evidence of

1

discrimination, or any other evidence from which a reasonable jury could conclude he was discharged because of race.

2. The District Court correctly entered summary judgment as to Boston's disparate-treatment theory based on an allegedly hostile work environment, because Boston failed to adduce evidence from which a reasonable jury could conclude he experienced a hostile environment: the alleged presence of swastika graffiti in a restroom that went unreported and one instance of coworker harassment that GPI effectively remedied, are not enough.

3. The District Court correctly entered summary judgment as to Boston's retaliation theory, because he lacked evidence from which a reasonable jury could find that his discharge was caused by his protected conduct: the year that elapsed between Boston's protected activity and his discharge was too long for temporal proximity to establish causation.

4. The District Court correctly entered summary judgment as to Boston's retaliation theory, because Boston lacked evidence from which a reasonable jury could conclude GPI's legitimate, non-retaliatory reason for his discharge – that he accumulated

2

over nine points under GPI's attendance policy – was a subterfuge for retaliation.

## IV.   CONCISE COUNTERSTATEMENT OF THE CASE

### A.   Relevant Facts

**1.   In 2016, Boston Begins Work At GPI's Vally Forge Facility, Where Employees Who Accumulate Nine Points Under The Progressive-Discipline Policy Were Typically Discharged**

GPI is a manufacturer of paperboard packaging used to package consumer goods with a converting facility near Valley Forge, Pennsylvania. (A861; Decl. of Gary Moore, ¶ 3). GPI hired appellant Boston as a temporary employee in the position of Sheeter Operator on December 21, 2016. (*Id.* at ¶ 6). Boston became a full-time sheet operator primarily working the night shift, and a member of the United Steelworkers Union (the "Union") after his first ninety days on the job. (*Id.*) From the beginning of his employment in 2016 through 2018, Boston received several written warnings about his performance. (A421 – 422; Boston Dep., 206:1 – 207:10). Boston also served as the Union's Vice President in 2020 and 2021 through the end of his employment at GPI. (A225 – 226; Boston Dep., 23:19 – 24:12).

There were three sheeting machines in the department where Boston worked. (A771; Moore Dep., 25:8-16). Two of the machines ran a single roll and the third machine ran a double roll. (*Id.* at 25:22-25). GPI cross-trained sheeter operators so

they could use both the single and double roll machinery. (A772; Moore Dep., 26:1-6). Single and double roll machines have different outputs, and so GPI had different production targets for each machine: 6,500 sheets per hour for single roll and 13,000 sheets per hour for double roll. (A774 - 775; Moore Dep., 28:7 – 29:14). A sheeter operator's production expectations depended on which machine they were operating. (*Id.*)

GPI maintains an attendance policy that applies to all hourly employees. (A798). Employees incur "occurrences" (often called "points") for each attendance violation. (*Id.*) Such violations include tardiness, departing one's shift early, failing to properly clock in or out, and no call/no show. (*Id.*) The attendance policy excludes certain categories of absence, including approved vacation time, jury duty, and funeral leave. (A799). If an employee completes a 60-day period with perfect attendance, his balance of attendance points will be reduced by one. (A798).

Discipline for attendance violations is issued progressively – at three points, an employee is issued a verbal warning, at five points he is issued a written warning, and at seven points he is issued a final warning. (A800). If an employee accrues nine points, he may be terminated. (*Id.*) Employees may contest the issuance of attendance points by filing a grievance through the Union. (A821 - 822). GPI's attendance policy also states that "[S]ituations may arise from time to time that

4

warrant special review.  The Company will determine when such conditions exist and determinate appropriate action." (A800)

GPI's Human Resources Coordinator Robin Bender was responsible for assessing employees points under this policy.  (A174; Bender Dep.; 31:19 – 32:21).  When an employee reached the maximum number of points under the attendance policy, GPI would notify the Union which would respond with proposals as to options for that employee.  (A128; Morrison Dep., 96:3 – 13).  The typical outcome was termination but, as per the attendance policy, exceptions were made in cases with extenuating circumstances.  (*Id.*)

The Union's CBA with GPI governed progressive discipline for non-attendance conduct and performance issues, which was a separate disciplinary track from attendance.  (A357 – 358; Boston Dep., 142:23 – 143:18).

> **2.    In 2019 and 2020, Boston Complains Of Race Discrimination, Including One Complaint Leading GPI To Discharge Boston's Co-Worker**

As Vice President of the Union, one of Boston's responsibilities was participating in grievances filed by Union members.  (A226; Boston Dep., 24:16-22).  Boston, himself, filed several grievances related to performance and attendance-related discipline he received during his employment at GPI.  (A692 – 704).  Between his role with the Union and his own experiences filing grievances, Boston was familiar with the process.

While Boston primarily worked the night shift, on the occasions when he worked the day shift he reported to Shift Supervisor Gary Moore. (A861). The record evidence shows that Moore issued Boston two disciplines during Boston's employment, dated February 15, 2019 and August 26, 2019. (A665). Boston, in turn, submitted three complaints to GPI's management about Moore. First, on August 27, 2019, Boston complained to Human Resources Manager Kevin Morrison that Moore spoke disrespectfully to Boston by asking him "so are you going to finish this fucking job or are you just going to keep dicking around?" (SA001). Next, on November 21, 2019, Boston filed a grievance alleging that Moore wrote up Boston for not operating his machine at full speed and for being on his phone. (*Id.*) Finally, on November 3, 2020, Boston filed a grievance alleging that Moore failed to follow the sheeter schedule and gave special treatment to William Dennis and Doug Detweiler. (*Id.*) None of the three complaints mentioned race.

During Boston's employment, graffiti appeared on a restroom wall at the Valley Forge facility: the words "FUCK GPI" next to a swastika. (Appellant Br., 5). This graffiti was not reported to GPI's management by anyone, including Boston himself, during Boston's employment. (A643 ¶ 15).

On April 29, 2020, Boston reported to Morrison that he heard about a coworker – William Dennis – using the n-word to refer to Boston in the workplace. (A655). Dennis held the same position as Boston and worked the same machine but

on the earlier shift. (A439 – 440; Boston Dep., 224:15 – 225:3). Morrison, who is Black, launched an investigation and immediately suspended Dennis pending that investigation. (A113 – 114; Morrison Dep., 81:24 – 82:8). The initial disciplinary outcome, by agreement between the Union and GPI, was for Dennis to be suspended. (A114 – 115; Morrison Dep., 82:23 – 83:16). Morrison believed that was the highest level of discipline available for the nature of offense he was found to have committed. (*Id.*) That disciplinary decision, however, was subject to review by GPI's Director of Human Resources. (*Id.*)

Upon review, GPI's Director of Human Resources decided to convert Dennis' suspension to a termination, effective May 5, 2020. (A646). After Dennis' discharge, the Union filed a grievance on Dennis' behalf seeking the reinstatement of his employment. (A442; Boston Dep., 227:13-20). Boston, as Union Vice President, participated in the grievance procedure and did not oppose Dennis' reinstatement. (A440 - 441; Boston Dep., 225:12 – 226:8). The grievance was denied and GPI's termination of Dennis' employment was upheld. (A445; Boston Dep., 230:3-22).

### 3. In 2021, Boston Is One Of 14 People GPI Discharges For Accumulating Over Nine Attendance Points

As of May 29, 2021, Boston had accumulated 10.5 attendance points. As the District Court summarized:

> [Boston] had a total of three attendance occurrence points in February 2021 and accumulated an additional 7.5 attendance points between March and May 2021 as follows: one point for an absence on March 20, 2021; one point for an absence on April 17, 2021; one point for an absence on May 6, 2021; one point for a late call out on May 6, 2021; one point for an absence on May 7, 2021; one point for an absence on May 17, 2021, ½ point for being late on May 24, 2021, and one point for an absence on May 29, 2021.

(A006).    On June 3, 2021, Bender issued Boston a letter conveying that his employment with GPI was terminated as of May 29, 2021.  (A006).  The Union grieved the termination, but Boston himself did not object to the legitimacy of the attendance points.  (A469 – 470; Boston Dep., 254:5 – 255:15).  The Union's grievance was denied.  (A860).  Boston never responded to the Union regarding the grievance and did not participate in providing any information.  (SA002 - 003).

In 2021, GPI terminated the employment of 14 individuals for violating the attendance policy.  (A869).  Of those 14 individuals, eight were White, three were African-American, one was Asian, one was Hispanic/Latino, and one was non-Hispanic/Two or More Races.  (*Id.*)  In keeping with the language of the policy, however, GPI does not automatically terminate the employment of every individual that reaches nine attendance points.  (A798).  It will consider special circumstances (such as medical reasons) and may adjust discipline level as part of the grievance process.  (*Id.*)  For example, Roman Ramos accumulated nine attendance points as of October 25, 2021.  (A717).  Ramos is African-American.  (A022).  GPI did not terminate Ramos' employment, but instead adjusted his points to reflect a period of

60 days with perfect attendance and where certain points had been improperly assessed where they should have been excused based on information provided by Ramos. (A717).

Similarly, Derrick Hamilton, who is African-American, incurred nine and one-half attendance points as of July 14, 2020. (A022; 728). GPI agreed with the Union to provide Hamilton with a "last chance agreement," which provided that any further absenteeism in the next six months would be subject to immediate discharge. (*Id.*). In agreeing to grant Hamilton a last chance agreement, Morrison, on behalf of GPI, noted to the Union that Hamilton took accountability for his attendance and "owned his poor management of his attendance points and recognized that he allowed them to get to [sic] high for too long." (A725).

Michael Antenucci (Caucasian) reached nine attendance points on June 28, 2019. (A657). GPI's review of Antenucci's points showed that a number of his attendance points were attributable to his failure to submit a doctor's note for a three-day illness. (*Id.*). In a "one-time non-precedent binding decision," GPI and the Union agreed to consider Antenucci's unexcused medical absences as excused if Antenucci completed a subsequent exception period with perfect attendance. (*Id.*) GPI eventually terminated Antenucci for attendance reasons. (A362; Boston Dep., 147:6-17). Boston, in connection with his role as Union Vice President, was

involved in the grievance Antenucci filed following the termination of his employment. (A367; Boston Dep., 152:3-20).

The District Court identified seven total employees with whom GPI worked to adjust or reduce attendance points rather than terminate their employment: Mr. Ramos (African-American), Mr. Hamilton (African-American), Andy Webb (African-American); Omar Patino (Hispanic), Tiffany Reilly (Pacific Islander), Jon Hahn (Caucasian), and Mr. Antenucci (Caucasian). (A023).

Also in May 2021, before the termination of Boston's employment, GPI suspended Boston for two days for parking in a handicapped space – something he had done on at least three or four other occasions. (A455 – 457; 462; Boston Dep., 240:7 – 242:11; 247:13-18). This suspension was on a different track than his attendance points and was unrelated to his termination for attendance. (A357 – 358; Boston Dep., 142:23 – 143:18).

## B.    Procedural History

Boston sued on August 30, 2022. He alleged a disparate-treatment theory, asserting he experienced two employment actions because of his race: being subject to a hostile work environment and then discharged. He also alleged a retaliation theory, claiming he was fired because he opposed race discrimination. According to Boston, GPI thus violated 42 U.S.C. § 1981 and 42 U.S.C. § 2000e *et seq.*

GPI answered the Complaint on October 10, 2022.

After discovery, GPI moved for summary judgment on December 14, 2023. During the pendency of GPI's motion, the District Court ordered the parties to conduct supplemental discovery, which they did. Ultimately, the District Court granted GPI's motion for summary judgment on March 24, 2025. This appeal followed.

## V.   SUMMARY OF THE ARGUMENT

The District Court correctly dismissed Boston's claims of discrimination, retaliation, and hostile work environment on summary judgment.

While Boston argues that the *Muldrow v. City of St. Louis* decision requires reversal, his argument is based on a misreading of that case. *Muldrow* only clarified that claims of discrimination require "some harm" leaving an employee "worse off," rather than a "significant harm" that alters the terms and conditions of one's employment. Even under this clarified standard, however, Boston does not have a claim of discrimination because subsequent case law has held that being subject to an employer's ordinary disciplinary policy does not constitute "harm" under *Muldrow*. Likewise, Boston cannot claim he was harmed by using the single roll rather than the double roll machine. As for Boston's suspension for parking and his eventual termination for attendance, the District Court *already* considered these acts as adverse employment actions. Thus, *Muldrow* is of no moment. The District Court

11

properly reasoned that both actions were appropriate given that they were supported by legitimate, non-discriminatory reasons.

Next, Boston claims he has a viable claim of hostile work environment under *Muldrow*. He is wrong. *Muldrow* does not change the severe or pervasive standard for hostile work environment claims. Under the correct standard, Boston has no viable claim of hostile work environment where his only support therefor is the existence of swastika graffiti that neither he nor any other GPI employee reported to management and a single instance of coworker harassment that was reported and that GPI effectively remediated by suspending the offender within one day of Boston's report and terminating his employment within the week. To be clear, because of GPI's remedial efforts, there is no record evidence that Boston ever crossed paths in the workplace with the offender following his report to GPI, which ultimately culminated in the termination of the offender's employment.

As for Boston's retaliation claim, he engaged in at most two instances of protected activity, the last of which occurred in April 2020. His employment was not terminated until June 2021 for violating GPI's attendance policy after he incurred 10.5 attendance points – points he did not dispute. Boston argues that the evidence is sufficient to show a pattern of antagonism, but he is mistaken. He seeks to position a statement attributed to GPI's Human Resources Coordinator – Bender – that "Boston enjoys filing grievances" as evidence of a retaliatory motive, but none of

12

Boston's grievances were protected activity because they had nothing to do with opposing discriminatory practices.

## VI. ARGUMENT

### A. Standard of Review

This Court exercises plenary review over the District Court's order granting summary judgment. *See Hankins v. Temple University (Health Sciences Center)*, 829 F.2d 437, 440 (3rd Cir. 1987). Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). A dispute is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find the elements of the plaintiff's claim. *E.g., Hankins*, 829 F.2d at 440.

As in the district court, "[a]ll assertions of fact in [appellate] briefs must be supported by a specific reference to the record." LAR 28.3(c); *Aubrecht v. Pa. State Police*, 389 F. App'x 189, 193 (3d Cir. 2010). Factual averments with no support in the record should not be considered by this Court. *Mickens-Thomas v. Vaughn*, 407 F. App'x 597, 601 n.6 (3d Cir. 2011).

To prevail on his § 1981 claim, Boston must prove GPI would not have terminated his employment ***but for*** his race. *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1014-15 (2020). That Boston must meet a heightened "but-for" causation standard to prove his claim is significant because, at

summary judgment, the Court must evaluate the record "through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). Thus, to overturn the District Court's decision, this Court must find the record contains enough evidence to support the conclusion that GPI would not have terminated Boston's employment were he not African-American. *Comcast*, 140 S. Ct. at 1019. As the District Court properly found, the record contains no such evidence. Rather, it overwhelmingly shows GPI terminated Boston's employment because he violated its attendance policy by accumulating over nine attendance points – a reason having nothing to do with race. GPI would have terminated Boston's employment for this reason whether he was African-American, Caucasian, or any other race.

### B. The *Muldrow* Decision

Because Appellant's argument focuses so squarely on *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), a close look at that case is warranted. Its facts bear little resemblance to this matter. In *Muldrow*, plaintiff (a female police sergeant) was transferred out of the St. Louis Police Department's Intelligence Division, where she had worked for the past nine years in a highly prestigious role investigating high-profile matters, collaborating with federal law enforcement officials, holding regular hours, receiving perks in the form of an unmarked take-home vehicle, and working in plainclothes. 601 U.S. at 350 – 51. After a new (male) Intelligence Division

commander took over, he reassigned plaintiff to a new role supervising neighborhood patrol officers and replaced plaintiff with a male officer, whom he testified seemed a better fit for the Intelligence Division's "very dangerous" work. *Id.* at 351. While plaintiff's rank and pay remained the same, her new role looked very different. *Id.* Rather than working with federal law enforcement, she now was responsible for supervising neighborhood patrol officers, performing uniformed patrol work herself, administrative duties such as reviewing arrest reports, loss of perks such as the take-home vehicle, and a rotating schedule that required weekend work. *Id.*

Plaintiff challenged her transfer under Title VII. The issue in *Muldrow* was whether, despite plaintiff's title, pay, and benefits remaining the same, she could establish that her transfer imposed a materially significant disadvantage onto plaintiff such that it constituted an adverse employment action. 601 U.S. at 352 – 53. The Supreme Court held that Title VII does not require a plaintiff to demonstrate a materially significant disadvantage and instead only requires a plaintiff to show "some harm" by demonstrating that "the transfer brought about some 'disadvantageous' change in an employment term or condition" that leaves the employee "worse off." *Id.* at 354, 359.

### 1.    Discrimination

15

Following the *Muldrow* decision, courts in the Third Circuit have considered several appeals taken from orders granting summary judgment on Title VII discrimination cases. In *McCrorey v. City of Philadelphia*, No. 23-2539, 2025 WL 1392164 (3d Cir. May 14, 2025), the Third Circuit reversed the District Court's decision granting summary judgment on plaintiff's age discrimination claims under the Age Discrimination in Employment Act and the Pennsylvania Human Relations Act, holding that the District Court erred in finding that plaintiff failed to establish a prima facie case of age discrimination because his job transfer did not entail a "significant" change to his employment. 2025 WL 1392164 at *3. The facts there echoed *Muldrow*: while plaintiff, a police officer, retained his title and base salary, his new assignment was in a less prestigious department and was less likely to facilitate career advancement (in addition to providing fewer opportunities to earn overtime). The District Court held that the transfer did not qualify as an adverse employment action because it did not present a "significant" change to plaintiff's employment. The Third Circuit reversed, following the holding in *Muldrow* that the asserted employment action need only impose "some harm."

Even under *Muldrow*'s lessened standard, however, a plaintiff must still show that some tangible alteration of the terms and conditions of her employment occurred that left her "worse off" to state a claim of discrimination. 601 U.S. at 359. Vaguely pleaded differential treatment, in and of itself, does not constitute an adverse

16

employment action under *Muldrow* absent such a showing. In *MacDougall v. Rhuling*, Case No. 24-cv-0989, 2024 WL 3993213, at *8 (E.D. Pa. August 28, 2024), the District Court granted summary judgment as to plaintiff's claim of gender discrimination premised on the allegation that plaintiff's computer system differed from the computer system her male coworkers used because plaintiff did not provide "sufficient context as to how her system was different." Applying *Muldrow*, the Court held that plaintiff's allegation was insufficient to state a prima facie claim of disparate treatment. *Id.*

### 2.    Hostile Work Environment

The prima facie elements of a claim of hostile work environment are (1) plaintiff suffered intentional discrimination based on his race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would have detrimentally affected a reasonable person of the same race in his position; and (5) there is a basis for employer liability. *Leftwich v. Sec. United States Dept. of Treasury*, 741 F. Appx. 879, 882 (3rd Cir. 2018).

As an initial matter, *Muldrow* dealt exclusively with a claim of **discrimination**. There is no indication anywhere in *Muldrow* that the Court intended to supplant the "severe or pervasive" standard applicable to hostile work environment claims with the "some harm" standard that now applies to discrimination claims. This Court has continued to apply the "severe or pervasive"

standard to hostile work environment claims even when applying *Muldrow*'s "some harm" standard to discrimination claims raised in the same matter. *See Bennett v. SEPTA*, No. 24-1376, 2025 WL 1248815 (3d Cir. April 30, 2025); *also Russo v. Bryn Mawr Trust Co.*, No. 22-3235, 2024 WL 3738643 (3d Cir. August 9, 2024). Appellant does not cite a single case from this or any other circuit in which *Muldrow*'s "some harm" standard has been applied to a hostile work environment claim. (*See generally*, Appellant's Br.)

Accordingly, to the extent Appellant claims that the District Court erred in failing to apply *Muldrow*'s "some harm" standard to his hostile work environment claim, any such argument is meritless.

**C.    The District Court Properly Dismissed Appellant's Discrimination Claims Under Title VII and Section 1981**

Even under *Muldrow*'s more relaxed standard, the record is devoid of any evidence that GPI discriminated against Boston. A prima facie case of discrimination based on disparate treatment requires a showing that (1) plaintiff is a member of a protected class; (2) plaintiff was qualified for the position he sought to attain or retain; (3) plaintiff suffered an adverse employment action;[1] and (4) the

---

[1] In light of the *Muldrow* decision, Boston opts to use the terminology "harm" throughout his brief. (Appellant's Br., n. 3, at 22).

action occurred under circumstances giving rise to an inference of intentional discrimination. *Qin v. Vertext, Inc.*, 100 F. 4th 458, 473 (3d Cir. 2024).

The District Court found that two adverse employment actions occurred: (1) Boston's two-day suspension for parking in an unauthorized space; and (2) the termination of Boston's employment. (A011 – 012).

Regarding the suspension claim, the District Court reasoned that Boston could not plead a prima facie case of discrimination because Boston's suspension did not occur under circumstances giving rise to an inference of intentional discrimination. (A014 – 015).

With respect to the termination of Boston's employment, the District Court found that Boston pleaded a prima facie case of discrimination. (A014 - 015). GPI, in turn, produced evidence sufficient to prove that it had a legitimate, non-discriminatory reason to terminate Plaintiff's employment. (A015). The District Court then dismissed the discrimination claim premised on the termination of Boston's employment because he failed to present evidence that could support a finding of pretext. (A023).

Boston now urges that, under *Muldrow*, the District Court should have considered these actions as bases for his discrimination claim:

- Boston's transfer from a double to single roll machine;

- Write-ups Boston received during his employment;

19

- The "selective" enforcement of GPI's parking rules against Boston; and

- The termination of Boston's employment.

GPI addresses each.

### 1. Appellant's Transfer Does Not Constitute Prima Facie Discrimination

As set forth in full above, an actionable employment "harm" under *Muldrow* is a "disadvantageous" change that leaves the employee "worse off" than before. 605 U.S. at 347, 355. Here, Boston asserts that the District Court erred in failing to analyze shift supervisor Moore's act of reassigning Boston to "less efficient equipment" from "faster machines" as actionable harm under *Muldrow*. (Appellant's Br., 23 – 24).

Boston conveniently ignores that the District Court did, in fact, consider whether Boston's reassignment and subsequent discipline constituted adverse employment actions for his discrimination claim. Specifically, the District Court found that Boston successfully contested the discipline he received for underperformance on the new machine and that "there is no evidence that he was otherwise disciplined in connection with this or any other transfer." (A013). The District Court further found that there was "no other record evidence that [Boston] experienced any change in his working conditions when he was reassigned to work on new machines." (*Id.*)

20

While Boston is correct that *Muldrow* lessened the standard of what constitutes "harm," the District Court's findings here still dispose of Boston's discrimination claim even when applying the *Muldrow* standard. Other than the single instance of discipline for underperformance – **that Boston successfully contested** – his transfer did not bring "any change in his working conditions when he was reassigned to work on new machines." (A013).

If Boston claims that having gone through the disciplinary process itself constitutes harm, any such argument is meritless. *See Leite v. School District of Philadelphia*, No. 24-2607, 2025 WL 1564796, at *2, n. 3 (3d Cir. June 3, 2025) ("To the extent that [Appellant] contends that the disciplinary process itself constitutes an adverse employment action, that argument fails. She has not shown how the School District's disciplinary process—which was conducted according to procedure—constituted a "harm respecting an identifiable term or condition of employment.") (*citing Muldrow*, 601 U.S. at 355).

To the extent that Boston claims that being made to use the single roll machine as opposed to the double roll machine constitutes "harm" under *Muldrow*, again, this claim fails absent a showing of harm. *See MacDougall*, 2024 WL 3993213, at *8 (granting summary judgment as to discrimination claim based on disparate treatment where plaintiff failed to plead facts about harm other than being made to use a different computer system than her male counterparts). Again, here, the District

21

Court has *already* found that "[t]here is…no other record evidence that [Boston] experienced **any change** in his working conditions when he was reassigned to work on new machines." (A013) (emphasis added).

There is no need to remand for a more developed factual record. This Court can, and should, apply the facts found by the District Court and determine that, even under *Muldrow*'s lessened standard for harm, Boston cannot assert a prima facie case of disparate treatment discrimination based on his transfer to new machinery.

### 2. The "Fabricated Write Ups" Do Not Constitute "Harm," Regardless of *Muldrow*'s Lesser Standard

Next, Boston argues that the District Court erred in failing to consider the discipline he received (and successfully contested) as a potential basis of disparate treatment discrimination. (Appellant's Br., 29 – 30). Even under *Muldrow*, this claim fails.

Under both pre- and post-*Muldrow* jurisprudence, progressive discipline does not in and of itself constitute an adverse employment action. *See e.g., Leite*, 2025 WL 1564796, at *2, *Deans v. Kennedy House Inc.*, 998 F. Supp. 2d 393, 411 (E.D. Pa. 2014) (holding that progressive disciplinary warnings were not adverse actions because they did not affect terms and conditions of employment); *Raffaele v. Potter*, No. 09-3622, 2012 WL 33035, at *4 (E.D. Pa. January 6, 2012) (concluding, based upon Third Circuit's "clear precedent," negative performance evaluations were not adverse actions). *Muldrow* does not alter the fundamental purpose of Title VII and

Section 1981, which is to address workplace discrimination. It is neither intended nor equipped to "provide relief for general unpleasantness that can occur in the workplace, even if that unpleasantness may be motivated by racial animus." *Barness v. Nationwide Mut. Ins. Co.*, 598 F. App'x 86, 90 (3d Cir. 2015).

Here, when Boston refers to himself being "disciplined based on fabricated write-ups" (Appellant's Br., 29), he is specifically citing matters he testified were "small things that me and the manager both knew, you know, weren't big deals[.]" (A292; Boston Dep., 90:21-23). These still do not meet *Muldrow*'s lessened standard for establishing harm because Boston has not, and cannot, articulate how they substantively "disadvantage[d]" him or left him "worse off." *Muldrow*, 601 U.S. at 354, 359. By contrast, they appear to be the exact sort of "general unpleasantness" that the Third Circuit counsels against forming the basis of a Title VII or Section 1981 claim. *See Barness*, 598 F. App'x at 90.

During his employment at GPI, Boston went through the disciplinary process for what he called "small things that…weren't a big deal." (A292; Boston Dep., 90:21-23). Despite case law holding that going through an employer's disciplinary process does not constitute harm under both pre- and post-*Muldrow* standards, Boston now asks this Court to reverse the District Court's ruling on the basis that, for him, it does. This Court should reject Boston's invitation.

### 3. The District Court Correctly Found That GPI's Enforcement of its Parking Policy Did Not Carry an Inference of Discrimination with Respect to Boston

Boston next argues that the District Court erred in finding that the record does not support an inference that Boston's two-day suspension for violating the parking policy was a result of racial discrimination. Boston instead argues that "GPI harbored discriminatory intent for each harm levied against Boston[,]" pointing to GPI's "workplace culture" and so-called "statistical evidence." (Appellant's Br., 25-26). Boston identifies these four supposed indicia of discriminatory intent:

- A swastika of unknown origin that was scratched on a bathroom wall and went unreported to GPI's management;

- A supposed lack of diverse leadership;

- The incident in which Boston's coworker Dennis called him the n-word, for which Dennis was fired less than one week later; and

- Boston's replacement with a white employee.

As to the swastika, Boston *himself* concedes that no employee reported its existence to GPI management. (Appellant Br., 26). Thus, Boston's position seems to be that GPI's inaction regarding a problem of which it was unaware suggests discriminatory intent. This argument is self-evidently absurd.

As to the supposed exclusion of Black employees from leadership, the record evidence reflects that there were two department managers onsite, and Morrison testified that they were both white males. (A069 – 070; Morrison Dep., 37:21 –

24

38:2).    However, Boston's brief elides mentioning that Morrison himself was responsible for issuing the two-day suspension at issue here.  (A667).  Morrison is Black.  (A357; Boston Dep., 142:7-9).

More fundamentally, however, the District Court aptly found that "[Boston] has presented no evidence that would allow a factfinder to draw a reasonable inference that simply because no managers are racial minorities, GPI had a pattern of denying minority applicants managerial positions…Under these circumstances, [Boston]'s 'statistical evidence,' such as it is, requires pure speculation as to the cause of the racial make-up of GPI's managerial ranks."  (A018).  In his appeal, Boston sidesteps this deficiency and merely repeats that GPI lacked diverse leadership.   In absence of more specific evidence addressing the deficiencies identified by the District Court, this Court should not disturb the District Court's findings.

Next, Boston argues that "GPI normalized slurs."  (Appellant Br., 27).  His support for this bold claim is that when Dennis, Boston's coworker, referred to Boston using the n-word, Dennis initially received a suspension, i.e. the same penalty given to Boston for the parking violation.    (*Id.*)    This gross mischaracterization of the record warrants clarification.    First, Dennis was suspended during the pendency of GPI's investigation. (A114; Morrison Dep., 82:3-

8).  Regarding the discipline Dennis received, Morrison testified the decision-making process for Dennis' discipline entailed a joint meeting between GPI and the Union to discuss what level of discipline was warranted, subject to final approval of GPI's corporate leadership.  (A115; Morrison Dep., 83:1-16).  Morrison testified that he initially aligned with the Union that Dennis should be subject to what Morrison believed to be the highest level of discipline available: a final written warning and a five-day suspension.  (A117; Morrison Dep., 85:10-21).  Then, upon review by GPI's corporate leadership, the suspension was converted to a termination.  (A115, Morrison Dep., 83:10-16).  Thus, Boston's assertion that "parking violations and calling a coworker the n-word warrant the same punishment at GPI" is a blatant misrepresentation of the record evidence, and should be disregarded accordingly.  (Appellant Br., 27).  *See Mickens-Thomas*, 407 F. App'x at 601 n.6.

Finally, Boston argues that him being replaced with a Caucasian employee following his termination for exceeding the maximum allowed number of attendance points suggests an inference of discrimination regarding his (unrelated) suspension for parking violations.  (Appellant Br., 27).  To be clear, Morrison – who is Black – issued Boston's parking suspension (A667), while the termination was handled by Bender.  (A006).

26

Boston conveniently ignores *why* the District Court held that no reasonable factfinder could infer discrimination with respect to Boston's suspension for committing a parking violation.  The District Court so held because Boston failed to point to evidence suggesting that Boston was treated any differently than anyone else at GPI who violated the parking rules.  (A014) ("Plaintiff has…produced no evidence regarding who parked in the handicapped spot that day, whether that individual was an employee of GPI, or the race of any other GPI employees who improperly parked in handicapped parking spots without punishment.")

To establish an inference of discrimination, Boston must point to "comparator evidence, evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by [his] supervisors suggesting racial animus." *Leftwich*, 741 F. App'x at 789.

Here, Boston's only evidence takes the form of two videos showing cars parked in handicapped spaces without visible handicap placards.  (A014).  That is all.  There is no evidence concerning the identity of the drivers of either car, what year the apparent violations occurred, whether those individuals were even GPI employees, nor whether GPI punished those individuals.  Moreover, as Boston admits, his violation was not just in parking in an unauthorized space but also that he moved his car to a *different* unauthorized space after being asked to move from

the handicapped spot. (A455 – 457; 462; Boston Dep., 240:7 – 242:11; 247:13-18). Boston has thus failed to carry his burden of producing evidence from which a factfinder could reasonably infer discriminatory intent regarding his suspension for the parking violation. *See Mojica v. Advance Auto Parts, Inc.*, No. 15-cv-1418, 2016 WL 107844, at *5 (E.D. Pa. Jan. 11, 2016) (plaintiff cannot overcome summary judgment by relying on unidentified comparators). The District Court was correct to dismiss this claim.

### 4. The District Court Correctly Held That Boston's Termination Was Not Discriminatory

#### a. GPI Contends That Boston Cannot State a Prima Facie Claim of Discrimination

Boston cannot state a prima facie claim because the record is bereft of evidence supporting that any adverse employment action occurred under circumstances that give rise to an inference of intentional discrimination. This prong typically requires the introduction of comparator evidence showing favorable treatment of similarly situated employees that do not belong to the plaintiff's protected class or other circumstantial evidence showing a causal nexus between his membership in a protected class and the adverse employment action. *See Larochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 692-93 (E.D. Pa. 2016).

Here, the comparator evidence undercuts any inference of discrimination. GPI's attendance policy reserved GPI's ability to exercise discretion with respect to

28

employee violations. (A800). The record evidence shows that GPI occasionally exercised lenience for employees that reached the nine-point threshold, without regard for their race. (A023). That GPI did not do so for Boston does not suggest an inference of discrimination absent evidence of similarly situated, non-African-American employees receiving favorable treatment. *See Alinoski v. Musculoskeletal Transplant Found. Inc.*, No. 15-cv-0640, 2016 WL 3165622, at *4 (M.D. Pa. June 7, 2016), *aff'd* 679 Fed. App'x 224 (3d Cir. 2017) (plaintiff failed to demonstrate inference of discrimination where the record showed employees both within and outside plaintiff's protected class were treated more and less favorably than plaintiff).

> **b.    Even if Appellant Could State a Prima Facie Case of Discrimination, GPI Had a Legitimate, Non-Discriminatory Reason for Terminating Boston's Employment**

Regardless, even assuming *arguendo* that Boston can establish a prima facie claim for discrimination concerning the termination of his employment, the District Court was correct to dismiss Boston's discrimination claim because GPI had a legitimate, non-discriminatory reason for its actions taken with respect to Boston.

The Third Circuit has "cautioned courts on several occasions to avoid unnecessary intrusion into subjective [employment] decisions[.]" *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F,2d 509, 527 (3d Cir. 1992). An employer "may have any reason or no reason for [making a decision] so long as it is not a

discriminatory reason." *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995).

Here, there is no dispute over the essential facts. Under GPI's attendance policy, employees may be terminated upon accruing nine or more attendance points. (A798). As of May 29, 2021, Boston had accumulated 10.5 attendance points. (A006). Accordingly, Bender made the decision to terminate Boston's employment. (*Id.*). The Union then filed a grievance on Boston's behalf, but the termination was upheld. (A860). Boston himself did participate in the grievance process. (SA002 – 003).

Boston does not meaningfully contest that GPI stated a legitimate, non-discriminatory reason for its termination of Boston's employment. Thus, Boston seeks to salvage this claim by arguing that GPI's stated reason is pretextual. He cannot do so.

### c.    Boston Cannot Establish Pretext

Boston failed to establish that GPI's stated reason for terminating Boston's employment, i.e. violating the attendance policy, was pretext for discrimination.

Demonstrating pretext is a "difficult burden." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). It requires a plaintiff to "present evidence contradicting the *core facts* put forward by the employer as the legitimate reason for its decision." *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (emphasis in original).

Such evidence must be sufficient for a factfinder to reasonably "either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 347 (3d Cir. 2022).

Here, Boston cites in passing the aforementioned indicia of discriminatory intent – the swastika, the lack of diverse leadership, the Dennis n-word incident, and his replacement with a white employee – in a futile attempt to establish pretext. The reasoning set forth above is equally applicable here.

To establish pretext, Boston focuses more acutely on the treatment of his comparators and on the timing of his termination. GPI addresses each.

Boston argues that GPI's treatment of Antenucci suggests favorable treatment based on race for comparable conduct, i.e. violating the attendance policy. (Appellant Br., 33). But, Boston conveniently ignores the full scope of the comparator evidence, which shows that GPI, consistent with the attendance policy, frequently made exceptions regarding enforcement depending on the specific circumstances of the offense. GPI and the Union agreed to a one-time, non-precedential last chance agreement for Antenucci because a number of his points would have been excused had he submitted a doctor's note. (A657). Likewise, when Hamilton (African-American) reached the nine-point threshold, the Union and GPI

31

agreed to put him on a last chance agreement based on his unique circumstances. (A725). Boston tries to distinguish Hamilton's treatment from his own by arguing that Hamilton's last chance agreement was the result of advocacy from his supervisors, whereas Boston did not receive such advocacy because of his supervisors' alleged racial bias. (Appellant's Br., 35). That is not supported in the record. First, Hamilton took accountability for his attendance violations, a fact explicitly cited in the decision to give him a last chance agreement. (A725). There is no evidence that Boston did that. He didn't even participate in the grievance process. (SA002 – 003).

Regardless, it was not just Antenucci and Hamilton whom GPI offered leniency regarding the attendance policy. GPI provided the same or similar treatment after reviewing the specific facts and circumstances to Webb (African-American), Ramos (African-American), Patino (Hispanic), Reilly (Pacific Islander), and Hahn (Caucasian), consistent with the language of the policy allowing for exceptions as circumstances dictate. (A023). As the District Court aptly notes, evidence of "comparator employees…of multiple races…does not support a claim that race [was a] motivating or determinative factor[] in the adverse employment action[]." *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011).

Likewise, Boston's argument that the "timing makes the pretext undeniable" is meritless, and confusing. Boston argues that GPI terminating him while he was

32

grieving the death of his brother and the decisionmaker – Bender – noting that Boston enjoyed filing grievances in the past "completed GPI's campaign." (Appellant Br., 36-37). Boston does not elaborate on what his brother's murder has to do with Boston's race or his termination, as it occurred after the accumulation of the attendance points that led to his termination. (A653). Nor do Boston's grievances have anything to do with his race. The record is clear on this point – the only race-related grievance Boston participated in was *Dennis'* grievance following the termination of his employment for using the n-word. (A440 – 441; Boston Dep., 225:12 – 226:8). Boston participated in that grievance *on behalf of Dennis* due to his role as Union Vice President. (*Id.*) GPI's decision to terminate Dennis's employment was upheld despite the Union grievance. (A445; Boston Dep., 230:3-22).

There is no evidence from which a reasonable factfinder could disbelieve GPI's stated reason for terminating Boston's employment. Boston accrued 10.5 attendance points, which rendered him subject to immediate termination. (A006). The evidence shows that GPI frequently exercised discretion regarding this policy for employees of various races, including African-American if there were special circumstances and often in conjunction with a Union grievance. (A023). That GPI did not do so for Boston, however, does not permit a reasonable factfinder to

disbelieve that the decision was not motived by racial animus. *See Brewer*, 72 F.3d at 332.

### 5. Boston Cannot Save His Discrimination Claims by Arguing Mixed Motive

Boston briefly suggests that the District Court erred in failing to consider mixed-motive liability under Title VII. (Appellant Br., 37). Citing Justice Thomas's concurring opinion in *Ames v. Ohio Dept. of Youth Services*, 145 S. Ct. 1540 (U.S. 2025), Boston argues that "discriminatory animus was at least a motivating factor in his termination" citing the swastika graffiti, Dennis' n-word offense, "retaliatory comments," and Antenucci's supposedly favorable treatment with respect to attendance. (Appellant Br., 37 - 38).

The mixed motive theory of liability requires evidence from which a reasonable factfinder could conclude that an employer made an employment decision based on both legitimate ***and*** illegitimate reasons. *See Makky v. Chertoff*, 541 F.3d 205, 213 (3d Cir. 2008) (*citing Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

Here, the District Court need not have engaged in a separate mixed-motive analysis because it correctly found that no reasonable factfinder could have concluded that GPI had ***any*** illegitimate reason for the employment actions it took regarding Boston. *See Makky*, 541 F.3d at 213.

34

**D.      The District Court Properly Dismissed Appellant's Hostile Work Environment Claim**

Boston next argues that the District Court erred in dismissing his hostile work environment claim.   (Appellant Br., 38).   He contends that the discriminatory workplace culture at GPI was sufficiently "severe or pervasive" under both pre- and post-*Muldrow* standards.  (*Id.*)

Boston's argument is meritless because *Muldrow* did not alter the traditional analysis for a claim of hostile work environment.  The *Muldrow* case has nothing to do with hostile work environment claims.   Regardless, the District Court properly dismissed this claim under the traditional hostile work environment framework.

**1.      Boston Cannot State a Prima Facie Case Because GPI Took Immediate, Effective Remedial Action After Boston's Coworker Called Him the N-Word**

To state a prima facie case for hostile work environment, Boston must show that (1) he suffered intentional discrimination because of his race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person of the same race in his position; and (5) *respondeat superior* liability exists.  *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990).  In cases of coworker harassment, an employer may avoid *respondeat superior* liability if it effectively intervenes to prevent repetition of the harassment.  *See Huston v. Procter & Gamble Paper Prods.*

*Corp.*, 568 F.3d 100, 110 (3d Cir. 2000) ("[T]he employer cannot be liable under Title VII if its remedial action stopped the harassment.")

Here, the factual record is clear. Following the initial report of the comment by a coworker, on April 29, 2020, Boston emailed Morrison stating "I'm hearing that my coworker William Dennis used a racial slur when referring to me in front of 2 other coworkers. I hope that you guys are taking this seriously, because I'm taking this EXTREMELY serious!!!!!!" (A007). Boston held the same position as Dennis, but they worked different shifts. (A439 – 440; Boston Dep., 224:15 – 225:3). The next day, GPI suspended Dennis pending investigation of the incident. (A007). On May 4, 2020, GPI terminated Dennis' employment because of the incident effective the following day. (*Id.*) The District Court, citing *Huston*, *inter alia*, thus correctly held that because the undisputed facts prove that GPI effectively prevented repetition of Boston's coworker's harassing behavior, GPI could not incur liability for hostile work environment. (A025 – 26).

Boston cites *Castleberry v. STI Group*, 863 F.3d 259 (3d Cir. 2017) in support of his argument that the District Court erred by failing to consider Dennis' use of the n-word in reference to Boston with the appearance of a swastika of unknown origin that appeared in an on-site restroom. (Appellant Br., 38-39). *Castleberry* is distinguishable because – as Boston himself acknowledges – the individual that called plaintiffs the n-word in that case was the plaintiffs' supervisor. This is not a

36

mere distinction without a difference: supervisor harassment and coworker harassment are treated differently within the context of a hostile work environment claim. *Compare Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as [the "n-word"] **by a supervisor** in the presence of his subordinates[.]") (emphasis added) *with Huston*, 568 F.3d at 104 ("employer liability for co-worker harassment exists **only** if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action.") (emphasis added).

Here, as discussed *supra*, GPI took prompt and effective remedial action by immediately suspending Dennis and subsequently terminating Dennis' employment within a week of the n-word incident. Regarding the swastika, the record evidence shows that Boston himself never reported it, nor is it clear *anyone* at GPI reported its presence in the restroom to anyone in management. Given that Boston did not so much as report the incident, there is no record evidence from which a reasonable factfinder could conclude that it unreasonably interfered with Boston's work performance or discouraged him from remaining on the job. *See Gladden v. Ambler Healthcare Group, LLC*, No. 22-3432, 2024 WL 260960, at *2 (3d Cir. January 24,

2024) (affirming summary judgment for employer because no record evidence existed to suggest interference with plaintiff's work performance where plaintiff never reported co-worker's usage of racial slur). Likewise, here, no reasonable factfinder could conclude that the swastika graffiti appearing in an on-site restroom unreasonably interfered with Boston's employment when there is no record evidence of Boston nor anyone else at GPI reporting it to management.

### 2. *Muldrow* Did Not Establish a Lesser Standard for Hostile Work Environment Claims

As mentioned *supra*, *Muldrow* does not implicate claims of hostile work environment. Boston's argument, read liberally, appears to be that *Muldrow* lessened the standard of what constitutes discriminatory action under Title VII, and thus, the District Court should have considered a wider swath of alleged discriminatory conduct in assessing the viability of Boston's hostile work environment claim. (Appellant's Br., 40-41). But, that is not what *Muldrow* holds. *Muldrow* clarified the standard of what constitutes an adverse employment action under Title VII. *See* 601 U.S. at 354-55 ("To make out a Title VII discrimination claim, a transferee must show some harm respecting an identifiable term or condition of employment.") *Muldrow* has nothing to say about hostile work environment claims, and thus any argument that that holding somehow imported a lesser standard to Boston's hostile work environment claim that the District Court should have applied is meritless.

So, too, is Boston's argument that "[u]nder *Muldrow*, supervisors who cause 'some harm' through harassment trigger strict liability, foreclosing the *Ellerth* defense." (Appellant's Br., 41). Here, Boston cites the alleged conduct of supervisor Moore, i.e. reassigning Boston from the double roll machine to the single roll machine, the discipline that Boston received, Moore's alleged use of profanity, denial of equipment, and "contributing to his termination." (*Id.*)

GPI has addressed the first two examples and declines to belabor the point – even under the *Muldrow* standard, these were not tangible "harms" that left Boston "worse off." The District Court's findings of fact are sufficient to support that determination. Likewise, as to Moore's alleged use of profanity, denial of equipment, and "contributing to [Boston]'s termination," these would fail to meet the *Muldrow* standard. The only potential "harm" here is if Moore had anything to do with Boston's termination – **but he did not.** Bender was the sole decisionmaker with respect to Boston's termination, a fact that Boston has not disputed until this appeal.

For these reasons, Boston's hostile work environment claim fails.

### E.    The District Court Properly Dismissed Appellant's Retaliation Claim

Boston next argues that the District Court erred in dismissing his retaliation claim by applying the wrong legal standard and overlooking direct evidence of retaliatory intent. Boston's claim is meritless.

39

To establish a prima facie case of retaliation, Boston must prove that he (1) engaged in protected activity; (2) suffered an adverse employment action; and (3) a causal connection between the protected activity and adverse employment action exists. *Daniels v. Sch. Dist. Of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).  If Boston establishes a prima facie case, the burden then shifts to GPI to advance a legitimate, nondiscriminatory reason for its conduct. *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006).  If GPI does so, then the burden returns to Boston to show that the stated reasons are pretextual and that GPI's true motive was retaliatory animus. *Id.*

In his brief, Boston identifies two instances of protected activity: (1) a complaint that Boston made to Morrison at some unspecified date "at least one year before Mr. Dennis called [Boston] the n word" that Moore, Dennis, and Nonamaker were harassing him based on his race (A641 ¶ 4); and (2) Boston's April 29, 2020 complaint about Dennis' use of the n-word.  (Appellant Br., 44).  GPI terminated Boston's employment in June 2021.

### 1.    There is No Temporal Proximity Between Boston's Protected Activity and GPI's Discharge of Boston

As an initial matter, the time between Boston's final protected act on April 29, 2020 and his termination in June 2021 hardly suggests retaliatory animus.  The Third Circuit has routinely rejected retaliation claims premised on adverse employment actions occurring even closer in time to a plaintiff's protected activity.  *See e.g., Gethers v. PNC Bank*, 813 F. App'x 746, 750 (3d Cir. 2020) (one-year gap

40

following protected activity not unduly suggestive of retaliatory animus); *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n.*, 503 F.3d 217, 233 (3d Cir. 2007) (three-month gap not unduly suggestive of retaliatory animus); *Williams v. Phila. Hous. Auth. Police Dept.*, 380 F.3d 751, 760 (3d Cir. 2004) (two-month gap not unduly suggestive of retaliatory animus).

Here, Boston's own brief concedes that he did not engage in protected activity past April 29, 2020. (Appellant's Br., 46-47). GPI terminated his employment in June 2021. (A652). As a matter of law, he cannot plead a prima facie case of retaliation based on the temporal proximity between these events.[2]

### 2.  There is Neither Direct Evidence of GPI Having a Retaliatory Motive Nor a Pattern of Antagonism With Respect to Boston

Seemingly in recognition of the temporal proximity issue he faces, Boston alternatively pleads that he has a viable claim based on either direct evidence of retaliatory animus or a "pattern of antagonism" he faced from GPI ultimately

---

[2] While it is not specifically pleaded in Boston's brief, Boston may argue that that, following *Muldrow*, the Court erred in failing to consider whether other "harms" constituted adverse employment actions in the context of his retaliation claim. He has identified four such acts in the context of his discrimination claim: (1) his transfer to the single roll machine; (2) his suspension for parking violations; (3) write ups during his employment; and (4) his termination in June 2021. As discussed *supra*, neither Boston's transfer nor his write ups constitute "harm" under *Muldrow*. With respect to his parking suspension in May 2021, Boston faces the same problem as he does with his termination – it happened too long after his final protected act to suggest that GPI acted out of retaliatory animus. *See Gethers*, 813 F. App'x at 750.

culminating in the termination of his employment. (Appellant Br., 44). He has neither.

To establish a pattern of antagonism, Boston must establish a pattern of "[i]ntervening antagonism or retaliatory animus" that arose "at the time of or after the protected activity." *LeBoon*, 503 F.3d at 233-43. "If the plaintiff cannot show that the relationship in question became 'qualitatively different' after the protected activity, he cannot meet his burden…" *Culler v. Shineski*, 840 F. Supp. 2d 838, 847 (M.D. Pa. 2011) (citing *LeBoon*, 503 F.3d at 233). Boston must also point to evidence that the relevant decisionmakers knew about the protected activity that Boston engaged in at the time of the adverse action. *See Kier v. F. Lackland & Sons, LLC*, 72 F. Supp. 3d 597, 618 (E.D. Pa. 2014) ("It is only intuitive that for protected conduct to be a substantial or motivating factor in a decision, the decisionmakers must be aware of the protected conduct.")

Boston cites *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249 (3d Cir. 2017), a case in which plaintiff's employer – a university – initially tendered plaintiff a renewable contract as an associate professor, then reversed course and tendered plaintiff a terminal contract just one month after plaintiff filed an EEOC complaint against the university. *See* 851 F.3d at 261. Boston also cites *Kachmar v. SunGuard Data Sys., Inc.*, 109 F.3d 173 (3d Cir. 1997) in support of his pattern of antagonism argument. This case, too, is distinguishable. In *Kachmar*, the Third Circuit

42

explicitly did not find a pattern of antagonism, but instead held that the district court erred in overlooking direct evidence of the defendant's retaliatory animus, i.e. a statement that plaintiff was not on the management track because of her "campaigning on women's issues." 109 F.3d at 178.

A look at cases from this Circuit where courts *did* find patterns of antagonism is instructive. In *Woodson v. Scott Paper Co.*, 109 F.3d 913, 921-23 (3d Cir. 1997), the court held that the district court was correct to find a pattern of antagonism based on evidence that the plaintiff – the only African-American manager in the workplace – was set up for failure following his protected activity, including his placement as a leader in a low-performing division, the appearance of graffiti in the workplace after plaintiff's protected activity that used the n-word and threatened violence, and being subjected to a "sham" ranking process by individuals who were familiar with his complaints of discrimination. In *Robinson v. SEPTA*, 982 F.2d 892, 895 (3d Cir. 1993), the court found a pattern of antagonism where plaintiff's supervisors sought to provoke plaintiff to insubordination and deliberately miscalculated his attendance points through conduct such as refusing to accept documentation of his medical appointments.

Here, Boston's purported evidence of a pattern of antagonism fails because he cannot point to any appreciable change in his treatment following his protected activity and because the record is devoid of competent evidence that any of the

relevant decisionmakers were aware that he engaged in protected activity. As an initial matter, his first instance of protected activity – occurring at some point no later than April 2019 – triggered no retaliatory antagonism by Boston's own account. (Appellant Br., 46). As Boston's own brief illustrates, the instances of purported "retaliatory escalation" only began after Boston reported Dennis for the n-word incident on April 29, 2020. (*Id.*) Additionally, Boston cannot point to any deterioration or change to his working conditions following either instance of protected activity. The "pattern of antagonism" Boston asserts consists primarily of attendance and performance-related disciplinary measures, but the record shows that even before engaging in protected activity, Boston regularly incurred discipline for the same conduct. (Appellant's Br., 46 – 47). From the beginning of his employment in 2016 through 2018, Boston received several written warnings about his performance. (A421 – 422; Boston Dep., 206:1 – 207:10). To the extent that Boston contends that the bathroom graffiti is part of the pattern of retaliatory antagonism, there is no evidence in the record suggesting that it appeared after Boston first engaged in protected activity. Indeed, Boston himself alleges that it appeared in the restroom "throughout [his] employment" (Appellant Br., 5), i.e. both before and after he engaged in protected activity. Finally, with respect to his termination for violating the attendance policy, the decisionmaker – Bender – was

unaware that Boston had engaged in protected activity.  (A191 – 192; Bender Dep., 48:21 – 49:6).

There is even less evidence of direct retaliatory animus.  Boston argues that Bender's statement that Boston "enjoyed filing grievances" evidences retaliatory animus.  It does not because none of Boston's grievances were race-related.  Moreover, Boston falsely argues in his brief that GPI's "systemic retaliation strategy" was to shift from work-related discipline to "out-of-work things like parking violations [and] attendance points where they could deny progressive discipline protections and circumvent the grievance process."  (Appellant Br., 44).  This outrageous claim is belied by the record.  Attendance violations *were* subject to both progressive discipline and the grievance process.  Boston's own termination for attendance was the subject of a grievance (which he declined to participate in), and Boston himself had filed grievances relating to the assessment of attendance points both for himself and others in the past.  Boston's blatant misstatements of fact should be disregarded accordingly.  *See Mickens-Thomas*, 407 F. App'x at 601 n.6.

## VII.  CONCLUSION

For these reasons, GPI respectfully requests that this Court affirm the District Court's order granting summary judgment as to Boston's discrimination, hostile work environment, and retaliation claims.

Respectfully submitted,

Dated:  September 10, 2025

*s/ Barbara Rittinger Rigo*

Barbara Rittinger Rigo (PA 76630)
Kevin B. Frankel (PA 327459)
LITTLER MENDELSON, P.C.
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA  19102.1321
267.402.3016 (t)
brigo@littler.com
kfrankel@littler.com

*Attorneys for Appellee*
GRAPHIC PACKAGING
INTERNATIONAL, LLC

## <u>CERTIFICATE OF BAR MEMBERSHIP, COMPLIANCE WITH TYPE-VOLUME LIMITATION AND TYPEFACE REQUIREMENTS AND VIRUS CHECK</u>

I, Barbara Rittinger Rigo, counsel for Appellee Graphic Packaging International, LLC, certify, pursuant to Local Appellate Rule 28.3(d) that I am a member in good standing of the Bar of the Court of Appeals for the Third Circuit. I further certify, pursuant to Federal Rules of Appellate Procedure 32(a)(5)-(7), and Local Appellate Rules 31.1(c) and 32.1(c), that the foregoing Brief of Appellee is proportionately spaced and has a typeface of 14-point Times New Roman, contains 10,004 words (not counting portions excluded from the word count by Rule 32(f)), and that the text of the electronic brief is identical to the text of the paper copies. I further certify, pursuant to Local Appellate Rule 31.1(c), that Windows Defender has been run on this Brief before filing and that no virus was detected.

Date: September 10, 2025

/s/ *Barbara Rittinger Rigo*
Barbara Rittinger Rigo

# <u>CERTIFICATE OF SERVICE</u>

I, Barbara Rittinger Rigo, counsel for Appellee Graphic Packaging International, LLC, certify that on September 10, 2025, I filed the foregoing Brief of Appellee via the Court's CM/ECF system, causing a Notice of Docket Activity and a copy of the filing to be served upon the following counsel of record who are registered CM/ECF users:

Andrew Lacy, Jr. Esq.
The Lacy Employment Law Firm LLC
3675 Market Street, Suite 200
Philadelphia, PA 19104
412.301.3908
Andrew.lacy@lacylegal.com

*Counsel for Appellant*

Pursuant to LAR 31.1, seven hard copies of this Brief were sent to the Clerk of the Court via Federal Express:

Office of the Clerk
United States Court of Appeals for the Third Circuit
21400 United States Courthouse
601 Market Street
Philadelphia, PA 19106-1790

*/s/ Barbara Rittinger Rigo*

Date: September 10, 2025          Barbara Rittinger Rigo